MARY E. SALMONS v. DUN & BRADSTREET, Appellant.—162 S. W. (2d) 245.

Division One, April 16, 1942.

Rehearing Denied, June 3, 1942.

*Lathrop, Crane, Reynolds, Sawyer & Mersereau, Winston H. Woodson* and *James F. Walsh* for appellant.

500

*Charno & Drummond* for respondent.

BRADLEY, C.—Action for personal injuries received in a revolving door. At a jury trial, plaintiff obtained a verdict and judgment for $2900. Motion for a new trial was overruled and defendant appealed to the Kansas City Court of Appeals. The majority opinion of the court of appeals affirmed the judgment for $2150 upon condition that plaintiff file a remittitur of $750. [Salmons v. Dun & Bradstreet (Mo. App.), 153 S. W. (2d) 556.] Presiding Judge SHAIN, of the court of appeals, deemed the majority opinion

502

in conflict with the opinion of this court in Phillips v. Western Union Telegraph Co. (in banc), 270 Mo. 676, 195 S. W. 711, L. R. A. 1917F, 489, and asked that the cause be certified to this court. [Constitution, Art. 6, Sec. 6, Amendment of 1884.]

Error is assigned (1) on the refusal, at the close of the case, of a demurrer to the evidence; (2) on plaintiff's instructions 1 and 6; (3) on argument of counsel; and (4) on an alleged excessive verdict.

Plaintiff alleged that defendant furnished daily credit information in Kansas City to many subscribers, and had in its employ one Loren Jacobs; that a portion of the duties of Jacobs was to deliver such reports to subscribers; that on January 20, 1936, Jacobs was ordered by defendant to deliver a credit report to the Southwestern Bell Telephone Company; that, at the time, the entrance from the street to the telephone company office was through a revolving door containing several compartments; that on said date plaintiff had gone to the telephone office to pay a telephone bill and attempted to leave the office through the revolving door, and that while her body was between the edge of one of the compartments of the door and the side wall, Jacobs entered the door from the outside for the purpose of delivering to the telephone company a credit report prepared by defendant, and "that at said time and place said Jacobs so carelessly and negligently pushed, shoved and manipulated said door and in a violent, forceful and sudden manner so as to cause and permit plaintiff to be caught between the edge of one of the compartments of said door and said door sill or side of the wall, striking, crushing, catching and mashing her body and causing her to suffer injuries and damages; that said Jacobs pushed, shoved and manipulated said door as aforesaid, striking, crushing, catching and mashing plaintiff's body as aforesaid after he saw, or by the exercise of ordinary care, could have seen plaintiff in said position of danger of being caught between the edge of one of the compartments of the door edge and the wall and struck by the same, if said door were pushed, but that said Jacobs carelessly and negligently pushed and shoved said door around, thereby causing plaintiff to be caught, struck, crushed and mashed as aforesaid and causing her to suffer injuries and damages."

The answer was a general denial, and a plea of contributory negligence. The reply was a general denial.

The door had four compartments, and was about 7 feet, 6 inches in height. The bottom portion of the separate wings or leaves, was of brass, while the top portion included a glass inset about 5 feet in height and 3 feet in width. Attached to each wing were 2 brass handholds extending across the wing and about midway thereof. The telephone building faced south on 11th street, and the only entrance to the telephone company's business office was the revolving door, which revolved counter clockwise.

Plaintiff testified that she lived with her son; went to the telephone office to pay her son's telephone bill; that she paid the bill; talked

a few mniutes with a girl she knew and started to leave the office about 11:45 A. M. by the revolving door through which she entered; that as she stepped into the right side of the door, it came around; that she did not have to swing the door in order to have room to step in; that she could see through the door, but that she "didn't see anything" as she "stepped into the door;" that no one was in the door "on the outside;" that as she "stepped into the door the leaf came around and struck" her; caught her left breast. She said that she saw Jacobs "hit the door with his shoulder;" that when she first saw him he was coming in; saw "his shoulder against the door;" that at that time she had not "touched any part of the door;" that she "had not got clear inside."

Plaintiff further testified that she had her purse in her left hand and was caught in such a way as to press the purse against her left breast. "I was just squeezed in there; I couldn't move. Q. Then what happened? A. The man (Jacobs) looked up and saw me and released the door and I stepped back. . . . Q. When he released the door which direction did you step then? A. I just stepped back away from the door, a little west, northwest. Q. You mean back toward the direction you had come from in the business office? A. More to the west. Q. And then what did you do? A. Well, I just stood there. I was hurt and dazed and sick and I was shaking, so I don't just remember what I did do altogether; I just waited there; and the young man (Jacobs) came up there and asked me if I was hurt and I said yes, I was. Q. This young man you speak of came up and talked to you that you saw in the door, do you know his name? A. Yes; Loren Jacobs. Q. That is Loren Jacobs. Now, when he came up and asked you if you were hurt, what did you say? A. I told him I was hurt and I felt faint, and he asked me what he could do and I said, 'Well, you can help me over to that couch; I am afraid I am going to faint.' And he helped me over there. Q. To the couch? A. Yes; to the couch. Q. What did you do over there? A. I just sat there; sat down there. Q. Did you have any conversation with this young man then with reference to his name and where he lived, or anything? A. Yes, he gave me his name and address. Q. And when you saw Mr. Jacobs in that compartment shoving on it with his shoulder could you see his hands or what he was doing with his hands? A. No, I didn't see his hands when he was in the compartment. Q. When he came on in the business office did you see— A. He had his hands and arms full of envelopes this way (illustrating). Q. How was he carrying them? A. As I remember, he had them up in his arms like this (illustrating). Q. Had his arms across his chest? A. Yes. Q. Where were the envelopes? A. In his arms. Q. Up against his chest? A. Yes; up against his chest. Q. About how many envelopes did he have? Could you tell? A. I wouldn't know exactly. He had quite a few. Of course, I wouldn't have any way of knowing how many, but I imagine he had one hundred or more. Q. After he gave

you his name and address while you were sitting on this couch what did Mr. Jacobs do? A. He asked me what he could do and I told him to ask one of the men in the office there to come over, that I might faint. And he told some man there, and he came over in a few minutes.''

Leroy N. Davenport, defendant's office manager, and witness for defendant, testified that he had supervision over Jacobs; that Jacobs received a ''definite salary,'' and was paid twice per month; that his hours were from 8 A. M. till 5 P. M. Defendant has offices ''all over the United States and a few foreign offices,'' and at the Kansas City office, defendant had three route boys, and Jacobs' route was in the down town area from 9th street, south to 20th, and from Oak street west to Baltimore—11 blocks north and south, and 5 blocks east and west.

As a witness for defendant, Jacobs testified that in January, 1936, he was employed by defendant as ''a route boy;'' that a part of his work was ''delivering reports to various subscribers'' of defendant; that, on foot, he went out on delivery about 11 A. M., and returned around 3:15 or 3:30 P. M.; that on January 20, 1936, he had for delivery, 150 or 160 reports in separate envelopes [4-⅛ inches by 9-½ inches], and left the office about 11 A. M.; that he had made 4 or 5 deliveries before he came to the telephone company's office; that at the time he went through the revolving door he was carrying the bunch of envelopes in his left hand, the ''arm fully extended'' down to his side. ''Q. Tell the jury in what manner you went through the door that morning. A. I went through the door in my regular gait or walk, and I pushed the bar with my free hand. I saw no one in the door or it did not jam. . . . Q. After you got in the door and inside the business office did anyone come up to you? A. A lady stepped up to me about four feet north of the door inside of the building. Q. What did the lady say? A. She said she felt ill and would I tell the man over at the desk sitting nearby. Q. Did you go over and tell the man who was sitting at the desk? A. I told him.''

On cross-examination Jacobs said that he approached the telephone office from the east on the sidewalk on the north side of 11th street, and turned north into the revolving door, and that, after he turned north, he could see through the door, looked through it, saw no one; that he did not see plaintiff until after he left the door and got into the building. ''Q. You had not seen her at all before that? A. I had not. Q. And at that time you say she was standing some four or five feet from you? A. Approximately. Q. And you walked up to her, did you? A. No, she approached me. Q. She walked up toward you. And which one spoke first? A. She told me she felt faint. Q. Felt faint? A. And would I call the man over at the desk sitting nearby. Q. Did you first help her over to a couch? A. No, I didn't help her to a couch. Q. When she told you she felt faint you went right over to some desk and called the man? A. I

told the man. Q. You didn't say anything to her at all? A. That was about the end of our conversation. Q. She told you she felt faint? A. And asked me to tell the man sitting nearby. Q. You say she asked you to call the man? A. Yes. Q. She told you, 'I feel faint; call the man.' A. Yes. Q. At that time she had walked toward you. So you immediately went over and called the man? A. I did. Q. Did you see what he did? A. He asked me my name and telephone number. I gave it to him.''

As appears, supra, Jacobs, at the trial (May 1, 1940) testified that as he went into the revolving door, he was carrying the bunch of envelopes in his hand, arm extended down to his side. In his deposition taken July 8, 1936, he said that he was carrying the envelopes in his arm, but did not remember which arm. Also, in the deposition, he testified that at the time he talked to plaintiff, immediately after he entered the telephone company's office through the revolving door, she told him that she ''had been hurt in the door and asked me to call the man sitting at the desk nearby.''

The facts in the Phillips case, supra, were these: About 7 P. M. December 12, 1912, the plaintiff was standing on the sidewalk at the southeast corner of Grand avenue and Olive street, St. Louis, waiting for an approaching automobile to pass so she could cross the street. A newsboy, with a bundle of papers under his arm, was standing nearby on the sidewalk. A Western Union messenger boy, with a telegram in his hand, came running from the east along the sidewalk on the south side of Olive street, and said to the newsboy, ''Give me a paper.'' The newsboy refused and the messenger boy ''snatched one from the bundle and ran, looking over his shoulder, and collided with plaintiff with such force that she was knocked ten feet into Grand avenue and very seriously injured.'' Under these facts it was held that plaintiff could not recover.

In the Phillips case the court said [195 S. W. l. c. 712, 713]: ''In going into the consideration of this case it is well to have in mind that the boy who caused the injury which is the subject of the suit was not travelling on the street by permission of his codefendant (the messenger boy was made a party), but in the exercise of a public right valuable to himself as a facility for gaining a livelihood as well as to his employer. Had he not possessed this right his employer could not have conferred it nor taken it away. It went with his service as far as it was necessary to the performance of the duty involved, and no further. In all other respects and for all other purposes it remained his own. It was, like his health and strength, a part of his own equipment for the service in which he was engaged. We cannot arbitrarily assume that by the terms of his employment he was forbidden to seek, while on these trips, his own pleasure or profit in any manner consistent with the performance of his whole conventional duty, nor was the defendant (Western Union) under any obligation to so restrain his liberty of action, in the ordinary use of the public easement. . . .

Had this boy been furnished by the defendant with a horse to ride or an automobile to transport him in the performance of his duties, his management of these facilities would have been the management of his master, which would have been liable for his acts and omissions in such management.''

Referring to the authorities relied upon by the plaintiff in the Phillips case the court said [195 S. W. l. c. 713] : ''There is nothing in any of these authorities which applies *the doctrine* of *respondeat superior* (italics ours), or the principles on which it rests, to the facts in this case.'' Judge WOODSON, dissenting in the Phillips case, said : ''I dissent from the majority opinion for the reason that the same rule of law applies to the facts of this case as if the injury had been inflicted by an automobile instead of being caused by the messenger's boy negligently coming in physical contact with the plaintiff.''

In 17 St. Louis Law Review, 279, speaking of the Phillips case, it is said : ''The case is interesting in presenting the view that a master's vicarious liability under the rule of *respondeat superior* will not result from an act performed by the servant in a method or manner incident to his rights as a public citizen. . . . To preclude the vicarious liability of the master because a servant makes use of the public right, to which use the master gives the original impetus, would unduly narrow the operation of the rule of *respondeat superior*.''

In 27 Washington University Law Quarterly, 122, in a comment on the opinion of the court of appeals in the present case, it is said : ''The general rule of *respondeat superior* is that a master is responsible to third persons for injuries occasioned by the negligence or misconduct of his servants acting within the scope of their employment,'' citing Hunter v. First National Bank of Morrilton, 181 Ark. 907, 28 S. W. (2d) 712; Skala v. Lehon, 258 Ill. App. 252, 343 Ill. 602, 175 N. E. 832; Hughes v. Western Union Tel. Co., 211 Iowa, 1391, 236 N. W. 8; Funk v. Fulton Iron Works Co., 311 Mo. 77, 277 S. W. 566; Lajoie v. Rossi, 225 Mo. App. 651, 37 S. W. (2d) 684; Daniel v. Phillips Petroleum Co., 229 Mo. App. 150, 73 S. W. (2d) 355; Skvorc v. Hager, 93 Pa. Super. 527. The comment in the Washington University Law Quarterly points out that the doctrine of *respondeat superior* is based on public policy, citing 2 Mechem on Agency (2 Ed.), sec. 1874; Chaste v. New Haven Waste Material Corp., 111 Conn. 377, 150 Atl. 107, 68 A. L. R. 1497. Also, the comment says that the doctrine of *respondeat superior* has been applied in various situations involving the question of liability of the master for acts of the servant, and mentions these: For injuries to a child when the employer's delivery man, on foot, ran into the child on the sidewalk and injured it with ice tongs, Price v. Simon, 62 N. J. L. 153, 40 Atl. 689; for injuries to a pedestrian bumped into and knocked down on the sidewalk by the employer's delivery man, on foot, after making a delivery, Schediwy v. McDermott, 113 Cal. App. 218, 298 Pac. 107; and for injuries to a bystander who was run into and knocked beneath

a train by a railroad brakeman returning, on foot, to the train from a restaurant, M. K. & T. Ry. Co. v. Edwards (Tex.), 67 S. W. 891.

The comment in the Washington University Law Quarterly goes on to say that this court, in the Phillips case, held "that the employer was not liable for the injuries sustained, on the theory that at the time of the injury the messenger was using the sidewalk in his public right. The reason announced for this decision by the court is difficult to justify. It has been pointed out by high authority and sustained, in effect, by the cases in other jurisdictions that scope of the employment is not dependent on time or place, but rather on the connection of the act with the employment."

The Phillips case has been cited in Smith v. Western Union Tel. Co. (Mo. App.), 232 S. W. 480, l. c. 482, where the cook in defendant's lunch room caused injury to the plaintiff by threatening to put a mouse on her; it was held that the cook was not acting within the scope of his employment. In Snyder v. Western Union Telegraph Co. et al. (Mo. App.), 277 S. W. 362, l. c. 367, where plaintiff was struck by a motorcycle with a sidecar attached, driven by defendant's messenger boy, defendant's negligence was held a question for the jury.

In Lajoie v. Rossi et al., 225 Mo. App. 651, 37 S. W. (2d) 684, where plaintiff was injured by an automobile driven by defendant Tony Rossi's adult son who had been told by his father "to go down to the store and get some pancake flour and coffee," it was held that there was no evidence showing that the father directed the son to use the car (the son's car), or that the father directed the rate of speed. In Ritchey v. Western Union Tel. Co., 227 Mo. App. 754, 41 S. W. (2d) 628, l. c. 629, where the defendant's messenger boy, with his head down, ran out of the doorway of defendant's office and collided with the plaintiff who was walking along on the sidewalk, it was held the Phillips case controlled.

In State ex rel. Gosselin v. Trimble et al. (certiorari), 328 Mo. 760, 41 S. W. (2d) 801, l. c. 803, to quash the opinion in Gosselin v. Yellow Cab Co. (Mo. App.), 29 S. W. (2d) 186, where a driver of a Yellow Cab assaulted the driver of another cab company. The court of appeals held that the offending cab driver was doing nothing to further his employer's business at the time of the assault. The writ of certiorari was quashed.

In Green v. Western Union Tel. Co. et al. (Mo. App.), 58 S. W. (2d) 772, l. c. 774, where defendant's messenger boy, on a bicycle, struck plaintiff, it was held that there was no evidence that the messenger boy was on duty at the time. In Rohrmoser v. Household Finance Corp., 231 Mo. App. 1188, 86 S. W. (2d) 103, l. c. 110, where a collector for a loan company called at plaintiff's apartment to make collection on a loan to her and her husband, and suggested to her that there were plenty of men who would pay to be with her, and then approached her, tore her dress and injured her finger, it was held

508

that the collector's conduct was not "within the scope of his employment."

In Wright v. Crown Drug Company (Mo. App.), 90 S. W. (2d) 145, where defendant's agent, while on duty, ran his bicycle against plaintiff and injured her, it was held that the situation, in effect, was the same as if defendant had furnished the bicycle and a judgment for plaintiff was affirmed.

In Dismang v. Western Union Tel. Co. (Okla.), 24 Fed. Supp. 782, l. c. 784, where plaintiff claimed to have been struck by a bicycle ridden by one of defendant's messenger boys, it was held that there was no substantial evidence tending to show that it was defendant's messenger boy that struck plaintiff. In Chiles v. Met. Life Ins. Co., 230 App. 350, 91 S. W. (2d) 164, l. c. 168, where plaintiff was injured by the car which she was driving being struck by a car driven by defendant's collecting agent on a Kansas City street. A judgment for plaintiff was affirmed. In the Chiles case [91 S. W. (2d) l. c. 168] it is stated that while the Phillips case has not been specifically overruled, there is language in later decisions of the Supreme Court which "by implication, overrule the Phillips case." The "later decisions" were not pointed out.

Our research does not support the notion that the Phillips case has been overruled by implication, but it does reveal that the case stands alone, except for Ritchey v. Western Union Telegraph Co., supra, so far as concerns the notion that the fact that the messenger boy was on foot and on the sidewalk, at the time of injury to plaintiff in that case, would affect the application of the principle of *respondeat superior*. And in the Ritchey case the court of appeals said [41 S. W. (2d) l. c. 629] : "Whether the doctrine of the Phillips case is sound or unsound is not for this court; it is controlling, notwithstanding holdings in other jurisdictions to the contrary."

While Jacobs was referred to in the record, in the present case, as the "route boy," he was, in fact, a man, a married man. As appears, supra, Jacobs left defendant's office about 11 A. M. with 150 or 160 reports to deliver, and that when he arrived at the telephone building, he had made only 4 or 5 deliveries. He usually got lunch after he left the office of defendant, and usually took about 30 minutes for lunch. He also said that he endeavored to finish delivery and return to the office by about 4 o'clock in order to get certain office work finished by 5 o'clock. The area necessary to cover in order to deliver the 150 or 160 reports is not shown, but if Jacobs left the office at 11:00 A. M., took 30 minutes for lunch, made 150 deliveries, and returned to the office by 4 o'clock, he had an average of 1 minute and 36 seconds to the delivery. If he did not return to the office till 5 o'clock he had an average of 2 minutes to the delivery. In either case it is not likely that any grass grew under his feet while making the deliveries.

The majority opinion of the court of appeals distinguished the Phillips case from the present case in this wise [153 S. W. (2d) l. c.

559] "Jacobs was not upon a public sidewalk at the time he committed the negligent act resulting in plaintiff's injury. He was upon the property of the telephone company and was not using merely his health and strength, but an instrument which, although not owned by his employer, he was required to use in order to enter the building. It was the only entrance to the business office of the telephone company. It was necessary for him to use the door in order to enter the office of that company, which defendant knew, or should have known and, in the eyes of the law, defendant is in no different position than had it directed him to manipulate the door at the time in question."

Also, it would not be unreasonable to say that the messenger boy, in the Phillips case, when he snatched the paper from the newsboy and ran, looking back "over his shoulder," had departed from the scope of his employment, while in the present case, Jacobs, in entering the telephone building by the revolving door, was on no departure, but was in the discharge of his duty to deliver the credit report to the telephone company. And if he was negligent, to plaintiff's injury, in the use of the revolving door in the discharge of that duty then she can recover, absent contributory negligence, even though "rights as to the use of the door and the rights to the use of the sidewalk were rights given to the public generally" [153 S. W. (2d) l. c. 566].

As appears, supra, plaintiff, among other things, testified that as she "stepped into the door the leaf came around and struck" her; that she saw Jacobs "hit the door with his shoulder;" that she was "squeezed in there" and couldn't move; that Jacobs "looked up" and saw her and released the door. Also, the haste with which Jacobs had to move in order to deliver the 150 or 160 reports is of some significance, we think, and corroborative of plaintiff's evidence that the door *struck* her, and that Jacobs *hit* the door with his shoulders. Webster's New International Dictionary (2 Ed.), gives, among other definitions of *strike*, the following: "To hit with some force;" "to give a blow to;" "to come in collision with." And these of *hit*: "To strike or touch, usually with force;" "to bring into violent contact;" "to come into contact forcibly."

"It is settled law that a 'court should never withdraw a question from the jury, unless "all reasonable men, in the honest exercise of a fair, imparial judgment, would draw the same conclusion from the facts which condition the issue." . . . ' Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law, but of fact to be settled by the jury.' " [Courtney v. Ocean Accident & Guaranty Corporation, 346 Mo. 703, 142 S. W. (2d) 858, l. c. 860; Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, l. c. 1073, and cases there cited.]

We rule that the question of Jacobs' negligence in the present case was one for the jury, and we adopt the ruling [153 S. W. (2d) l. c.

560] of the Kansas City Court of Appeals that the question of contributory negligence was for the jury. Hence it follows that defendant's demurrer to the evidence was properly refused.

We think that the court of appeals correctly ruled the assignments on plaintiff's instructions 1 and 6, and on argument of counsel, and adopt the rulings [153 S. W. (2d) l. c. 560-563] on these assignments.

We agree with the ruling of the court of appeals that the evidence as to the personal injuries was not such as to justify a ruling that the verdict was excessive, but we do not agree in the ruling requiring a remittitur of $750 because plaintiff pleaded $500 damages for loss of earnings and pleaded that she incurred a liability of $250 for medical attention, supplies, etc., and then submitted to the jury damages for personal injuries only. As to this feature, the court of appeals ruled the excessive verdict assignment as follows [153 S. W. (2d) l. c. 564]: "Plaintiff's instruction on the measure of damages submits only bodily injuries she received by being caught in the door. It does not have the jury consider any loss of earnings or expenses incurred for medical attention, etc. Under these circumstances, defendant insists that the verdict is excessive in the sum of $750. This contention, we think, must be sustained. Plaintiff says that the prayer is no part of the petition and it is to be disregarded by the court except as to limiting the amount of recovery. However, the amount of the recovery was limited to $2900, which amount included all of the damages pleaded in the petition. These damages included the loss of earnings, expenses for medical attention, etc. In other words, the $750 covering these items was, of necessity, included in the $2900 sued for. Therefore, *in her petition,* plaintiff limited the amount of her damages for personal injuries to $2900 less $750, or $2150" (italics ours).

Plaintiff set out, in the petition, the personal injuries she received, but did not specify any sum as damages therefor. She was specific, however, as to the special damages for loss of time and liability for medical attention, etc. In Vogt v. United Rys. Co. (Mo. App.), 251 S. W. 416, it was alleged that *total* damages were $3000, and it was alleged that by reason of the personal injuries, the plaintiff was compelled to incur liability for medical and surgical services in the sum of $100, and for medicine in the sum of $10. There was no evidence as to any liability for medical or surgical treatment or for medicine, but the verdict was for the $3000. It was held that the verdict was $110 excessive. As stated in the Vogt case, it was *alleged* that the total damages was $3000, while in the present case, total damages were *not* alleged, and no amount was alleged as damages for personal injuries. It is true that plaintiff, in the prayer of the petition, asked for $2900, but it is also true that the prayer is no part of a petition. [Caldwell et al. v. Eubanks et al., 326 Mo. 185, 30 S. W. (2d) 976, l. c. 980.] Failure to submit special damages pleaded was an abandonment

of such. Not alleging amount of damages for personal injuries, and having abandoned special damages in the submission, we think the situation should be considered the same as if special damages had not been alleged, and we so rule.

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.