Caroline DE MARIANO, Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY,
a Corporation, Appellant.

No. 47750.

Supreme Court of Missouri,

Division No. 1.

Nov. 14, 1960.

Motion for Rehearing or to Transfer to
Court en Banc Denied Dec. 12, 1960.

Harry L. Bell, St. Louis, for appellant.

Robert Lee Smith, Roberts P. Elam, St. Louis, for respondent.

HOLLINGSWORTH, Judge.

Plaintiff, Caroline DeMariano, had verdict and judgment for $40,000 for personal injuries sustained when, as the evidence introduced in her behalf tended to show, defendant's servant George Hellmann walked into collision with her, causing her to fall to the paved surface of defendant's bus and streetcar terminal in the City of St. Louis, known as the "Wellston Loop". The trial court denied defendant's motion for judgment in accordance with its trial motion for a directed verdict. It also denied defendant's alternative motion for a new trial, but on condition that plaintiff remit $10,000 from the judgment theretofore rendered, with which order of conditional remittitur plaintiff made timely compliance. Defendant has appealed from the new judgment of $30,000 accordingly rendered, contending (1) that no submissible case was made under the respondeat superior doctrine; (2) error in the giving of verdict-directing Instruction No. 1 in behalf of plaintiff; and (3) such gross excessiveness of the judgment finally rendered as to require a new trial or, in the alternative, further substantial remittitur.

In connection with and as a part of the operation of its system of buses and streetcars as a common carrier of passengers for hire in the City and County of St. Louis, defendant owns and maintains the Wellston Loop, where its buses and streetcars arrive and depart on prearranged schedules and where its passengers are received into and discharged from these vehicles at designated "zones" therein. It is located west of Hodiamont and north of Easton Avenues. No vehicles other than those of defendant use or enter it. It is, however, a busy place, crowded with defendant's passengers, employees and invitees walking in "all sorts of directions" all over the area. It is approximately 100 feet in east-west width and more than 200 [1] feet in north-south length and its surface is paved.

A building, known as the White Mill, in which lunches and soft drinks are served, is situate upon the loop, near the southwest corner thereof. The building proper fronts 16 feet on Easton Avenue and extends back north into the loop a distance of approximately 53 feet. It has a wide roof, which projects 24 feet beyond the west side of the building proper and 28 feet beyond its east side. Under that projecting roof, immediately adjacent to the west side of the building proper, there is a 5-foot wide sidewalk extending northward from Easton Avenue for the entire length of the building for use of passengers, employees and invitees of defendant in going to or departing from buses and streetcars. The space under the portion of the roof projecting beyond the east side of the building proper is open and, apparently, it is also used for passage to and from the northern portion of the loop.

Three of the loading and unloading zones are frequently referred to in the evidence in this case. These are located north and

---

1. Distances stated herein are, in some instances, approximations made from the plat and scale shown thereon.

northeast of the north end of the White Mill. The area and location of each is marked with yellow lines painted upon the pavement. The south end of one of them, the Ramona-Ferguson bus zone, lies 28 feet north of the east portion of the White Mill building proper. It is about 9 feet wide and extends northward about 104 feet. The Page bus zone lies 9 feet east of and parallel with the Ramona-Ferguson zone. The Wellston streetcar loading and unloading zone lies 8 feet east of and parallel with the Page bus zone.

The evidence adduced in behalf of plaintiff supports a finding of the following facts: Plaintiff, married for 25 years and residing with her husband during that time in the general vicinity of 6271 St. Louis Avenue, regularly rode Ramona and Ferguson buses which received and discharged passengers at Wellston Loop and was familiar with its layout and operation. Shortly before 11 o'clock on the morning of December 28, 1956, she purchased a round trip ticket and boarded a Ferguson bus near her home and rode to the loop, arriving there in 5 to 10 minutes. The bus entered the loop from the north and stopped at the unloading portion (north end) of the Ramona-Ferguson bus zone. She alighted and walked southwardly to and across Easton Avenue where she shopped at several stores. When she had finished these chores, she went back to the loop to return by bus to her home. In so doing, she crossed Easton, walked to the southwest corner of the White Mill and thence north upon the sidewalk extending along the west side thereof to the northwest corner of the building. At that point she saw a Ferguson bus stopped in the loading portion of the Ramona-Ferguson bus zone, with its front at the south end of the zone, approximately 25 to 30 feet from her. At that moment no one was approaching or near the entrance door of the bus, nor was there anyone between her and the bus. Walking at a normal rate, she proceeded in a north and slightly easterly direction from the northwest corner of the White Mill di-

rectly toward the bus entrance door, all the while looking forward toward the bus. When she had reached a point approximately 12 feet from the right front end of the bus, she was, without warning or knowledge whatever by what or whom, suddenly and violently struck in the back on her left side. The violence of the impact caused her to fall to the pavement in a sitting position on her right hip. Stunned for a few moments, she soon thereafter realized that a man (admittedly, defendant's streetcar operator Hellmann) in the uniform of defendant's operators was standing by her left side. He attempted to lift her but was unable to do so. However, he, aided by another (unidentified) man, assisted her into the bus and, it so happened, seated her near a woman whom she casually knew. Upon arrival at plaintiff's usual place of leaving the bus, this woman helped her into Schnuck's Market. There, plaintiff's husband, upon call by telephone, met and took her to a hospital, where it was discovered she had suffered, among other injuries, a broken hip.

George Hellmann, called as a witness by plaintiff, testified that he was "on duty for the company (defendant) at the time of this collision" between him and plaintiff and that he did not at any time see her prior to the collision. Other testimony given by Hellmann was that on the day of the collision he was operating a Wellston streetcar and had made one round trip from the loop before it occurred. Upon completion of that round trip, he had stopped his streetcar at the unloading zone of the Wellston car tracks. When he stopped his car at that point, he had a "layover" or "free" period of 12 or 13 minutes before he was scheduled to take his streetcar out for another trip at 11:35 a. m. (A layover, the evidence shows, consists of whatever period of time there may be between the time of arrival of the streetcar at the terminal upon completion of one of its trips and the scheduled time for departure on the next trip.) During such periods Hellmann is free to do what he wants as

long as he stays within the rules of his employer. He may walk around the loop, go to a toilet maintained by defendant for the exclusive use of its employees, enjoy soft drinks or a hamburger, but he never leaves the loop. He would be permitted to go to stores on Easton Avenue to buy an item if "I think I need it bad I can go and get it," just so he gets back to leave on his streetcar at 11:35. "They have several different rules, something like you said before, going into Marre's there"—a tavern situate adjacent to the southwest corner of the loop and at which alcoholic drinks are sold. "I wouldn't dare to go into Marre's while I am working."

Upon arrival at the loop that day, Hellmann, according to his testimony, went to the toilet maintained by defendant, which is located in the northwest corner of the White Mill building. Leaving the toilet at about 11:30 o'clock, he started walking in a northeasterly direction toward his streetcar, which was some 55 to 60 feet northeast of the toilet, for the purpose of taking it out on its 11:35 scheduled trip. After taking several steps toward the car, looking in the direction in which he was walking, he turned his head to his left (northerly) to see if any of the buses in the Ramona-Ferguson or Page bus lanes was about to start out. At that moment the collision between him and plaintiff occurred. The place of its occurrence was approximately 15 feet south of the southeast corner of the Ramona-Ferguson bus zone and 30 to 35 feet from the streetcar to which Hellmann was returning. The edge of Hellmann's right shoulder came into contact with plaintiff, but he did not see her prior to or at the time of impact.

Defendant's evidence relating to the manner in which the collision occurred was given by the operator of a Page bus which was standing in the Page bus loading zone when the collision occurred. He testified: When he first saw plaintiff she was on the east side of the White Mill and walking northward in the general direction of his bus, which was immediately east of the Ferguson bus. When she came near the north edge of the overhang of the roof over the White Mill, she "walked fast" in a northwest direction toward the Ferguson bus. Witness had not then seen Hellmann. When first seen by the witness, Hellmann had stopped and was standing facing north. Plaintiff continued to walk fast in a northwest direction until her left side came into contact with Hellmann's right side. After the collision plaintiff was on the pavement in a sitting position. There were no other persons in the vicinity. The witness, by use of a plat, indicated that the collision occurred about 13 feet south of and slightly east of the east side of the Ramona-Ferguson bus zone.

Edwin J. Lee, defendant's supervisor of Wellston streetcar operators, called as a witness by defendant, defined the "free" time of its operators as "recovery" time, during which they may go anywhere they want "within reason", "around the premises there, around the restrooms or restaurant"; and may leave the premises, but they may not take a drink of alcoholic liquor.

 The first of defendant's contentions, as stated in its brief, is that "there was no substantial evidence to support the proposition that the defendant * * * should answer in damages for alleged negligence of a streetcar operator occurring while the streetcar operator was a pedestrian and was not in the actual employment of the defendant at the time of the occurrence, or, assuredly, was not acting within the scope of his employment at the particular time." In determining that contention, we review the evidence in the light most favorable to plaintiff, give to her the benefit of all favorable inferences flowing therefrom and disregard defendant's evidence except as it may aid plaintiff. Daniels v. Smith, Mo., 323 S.W. 2d 705, 706; Stokes v. Four-States Broadcasters, Mo., 300 S.W.2d 426, 428. And if there is uncertainty arising either from conflict in the testimony or because the undisputed facts may lead reasonable men to draw different conclusions as to whether defendant's servant, Hellmann, was acting within the course and scope of his employment, the question becomes not one of law

but of fact to be settled by the jury. Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W.2d 589, 593; Salmons v. Dun & Bradstreet, 349 Mo. 498, 162 S.W.2d 245, 251, 141 A.L.R. 674.

Defendant insists, first, that since the collision occurred at a time when Hellmann was on layover at the loop before commencement of his next run, during which period he was free to do as he pleased without direction from defendant, and there being no evidence as to whether he was paid for such layover time, it cannot be reasonably found that he was in fact an agent or servant of defendant during said period.

■ We think that contention unsound. Some eight minutes prior to the collision, Hellmann, in the regular course of 25 years of employment as a streetcar operator for defendant, after making a round trip in defendant's Wellston streetcar, had stopped it at the Wellston car unloading zone in the loop. But his duties with respect to the operation of that car for the remainder of the day were by no means at an end. In the regular course of his employment it was his duty to place the car at the Wellston loading zone for entry therein by such passengers as might desire to enter it prior to the time fixed for the next trip (and, we may assume, to attend to their orderly and safe entry into it) and then to take the car out on another trip, which was scheduled within five minutes after he left the toilet. Such evidence justifies a finding that the streetcar remained "in operation" under his dominion and control as an agent or servant of defendant during the time it stood temporarily at rest in the loop, awaiting loading and departure on schedule with Hellmann as its operator. Karnes v. Ace Cab Co., Mo. App., 287 S.W.2d 378, 379; Thaller v. Skinner & Kennedy Co., Mo.Sup., 315 S.W.2d 124, 130. We hold that the facts and circumstances shown in evidence in this case support a finding that Hellmann was on duty as an agent and servant of defendant

chargeable with the performance of his regular duties as an operator of the Wellston streetcar during the interval it was in the loop; the fact that he also had some free time, during which he could relax or attend to the demands of nature, does not alter that fact. The question then is narrowed to whether Hellmann was acting within the scope of his employment at the time he was returning from the toilet to the streetcar.

■ Defendant's liability under the doctrine of respondeat superior depends upon whether there was substantial evidence to support the finding made by the jury that at the time Hellmann and plaintiff collided Hellmann was acting within the scope of his employment. Hopkins v. J. I. Case Company, Mo.Sup., 293 S.W.2d 402, 405. It is true, as suggested by defendant, that the test to be applied is not merely that the act with which the employer is sought to be charged was done during the time or period of the servant's employment, but whether the act was committed in the prosecution of the business of the employer. Oganaso v. Mellow, 356 Mo. 228, 201 S.W.2d 365, 368; Beckwith v. Standard Oil Co., Mo.Sup., 281 S.W.2d 852, 854–855, and cases there collated.

Defendant says that "Mr. Hellmann had temporarily suspended his duties for the defendant by virtue of his being at the end of the line on 'free time' for some 13 minutes before he was to resume his employment. He was not about his employer's business at the time of this occurrence. He had just fulfilled a common need of all men, viz., a call of nature. Such a personal act could have been satisfied on or off the premises of defendant. It had nothing to do with the occurrence as described by plaintiff or other persons testifying in the case. Mr. Hellmann had not yet returned to his streetcar to resume his employment."

In support of that argument numerous cases[2] have been cited by defendant, upon

---

2. Stokes v. Four-States Broadcasters, Mo.Sup., 300 S.W.2d 426; Stone v. Reed, Mo.App., 247 S.W.2d 325; Curtis v. Juengel, Mo.App., 297 S.W.2d 598; Green

one of which strong reliance seems to be placed, to wit: Stone v. Reed, Mo.App., 247 S.W.2d 325. In that case the essential facts were: The driver of defendant's tractor and trailer left Indianapolis for Kansas City. When he arrived in St. Louis en route, early Sunday morning, he stopped at a service station parking lot and rested in accordance with regulations, because he had been on the road between 7 and 8 hours. On Sunday evening he detached the tractor from the trailer and drove 8 miles to an eating establishment, and while he was returning to the service station he was involved in an accident. The court there said, and we think correctly so, loc. cit. 332: "Do the facts warrant an inference that Reed's use of the tractor in driving to Bernard's Steak House was to facilitate his labor and service, thus bringing it within the course and scope of his employment? We are of the opinion that the facts of the case do not permit this inference. This is not a case where one, engaged in the pursuit of the master's business, deviates from the strict course of duty to attend to necessary, usual or incidental personal wants, the pursuit of the master's business continuing to be the controlling purpose of the trip. Reed was not performing his duties, that is, hauling freight at the time of the accident. His duties in that regard had been suspended several hours before he left with his friend to go to Bernard's Steak House. He had abandoned his employer's service and, for the time being, was strictly on a mission of his own."

We are not persuaded that the facts in either the Stone case or the other cases cited by defendant are apposite in the situation here presented.

As stated in 35 Am.Jur., Master and Servant, § 172, p. 600: "A temporary stoppage of work by an employee for purposes which are the inevitable and necessary incidents of daily life must of necessity be in the contemplation of the parties in every employment, and hence does not suspend the relation of employer and employee. The duties and liabilities incident to the relation are generally held to continue while employees are temporarily resting, procuring drinking water, or, for the purpose of urinating or defecating, using the privy which has been provided for their convenience." The principles above announced have been recognized and confirmed in Missouri. Schultz v. Moerschel Products Co., Mo.App., 142 S.W.2d 106, 110; Mangiaracine v. Laclede Steel Co., 347 Mo. 36, 145 S.W.2d 388, 390.

We have not been cited to nor have we found any Missouri case where the fact situation may be said to be completely analogous to that here presented. However, cases from other jurisdictions seem to be well in point. For instance, in Missouri, K. & T. Ry. Co. v. Edwards, Tex.Civ.App., 67 S.W. 891 (cited in Salmons v. Dun & Bradstreet, 349 Mo. 498, 162 S.W.2d 245, 249, 141 A.L.R. 674), the facts showed that a brakeman left his place of duty on the train and went to a restaurant. In returning to the train, he ran into and injured plaintiff, who was lawfully at the depot to meet incoming friends. The court had this to say, 67 S.W. loc. cit. 891: "Whether or not the brakeman was in the discharge of his duties when he knocked appellee under the train was more a question of law than one of fact. His place of duty was on the opposite side of the train, but the evidence of appellee tended to show that he had gone to a saloon or restaurant on the side of the train where the accident occurred, and was hurriedly returning to board the train, then just moving away, when he ran against appellee. While he may not have been on his master's business in stepping aside to the saloon or restaurant, *we think it must be held that he was when he ran over appellee in the effort to resume his accustomed place of service.*" (Emphasis supplied.) Other

v. Western Union Telegraph Co., Mo. App., 58 S.W.2d 772; Calhoon v. D. C. & E. Mining Co., 202 Mo.App. 564, 209 S.W. 318; Miceli v. Williams, Mo.App.,

293 S.W.2d 136; Montana v. Nenert, Mo. App., 226 S.W.2d 394; Melcher v. Handelman, Mo.App., 249 S.W. 152.

cases fairly illustrative of the principle announced in that case are Cromwell v. Los Angeles Ry. Corp., 102 Cal.App., 499, 283 P. 375; Ryan v. Keane et al., 211 Mass. 543, 98 N.E. 590, 47 L.R.A., N.S., 142; J. C. Penney Co. v. McLaughlin, 137 Fla. 594, 188 So. 785; Hobba v. Postal Telegraph Cable Co., 19 Wash.2d 102, 141 P.2d 648.

■ In the instant case Hellmann had testified, without objection, that he was "on duty for the company at the time of this collision" and we have held that the other facts in evidence warrant a finding to that effect. Accepting as true the testimony favorable to plaintiff and indulging such inferences as reasonably flow from it the jury could have found that Hellmann, by defendant's rules, express or tacitly implied, was expected to remain upon the loop premises during layovers, in the absence of good cause to the contrary. The fact that defendant maintained at the White Mill a toilet for the exclusive use of its operators is some evidence of the fact that Hellmann was not only not supposed to leave the loop for the specific purpose for which he had left his streetcar some minutes before the collision, to wit: to answer a call of nature, but that he was impliedly invited to use defendant's toilet during hours of duty as his needs required. To illustrate our views, let us suppose that on this occasion Hellmann had not been impelled to go to the toilet and had remained at his streetcar during the layover and that as plaintiff approached or entered the streetcar he negligently collided with and injured her: could defendant successfully assert that by virtue of the fact that his duties did not require him to remain at the car during layover, he was a mere bystander and was not acting within the scope of his employment? We most surely think not. The difference in the facts in evidence and those above supposed is one of degree only.

We entertain the definite opinion and, consequently, hold that a jury reasonably could find that when Hellmann left the toilet maintained for his use on defendant's premises and was in the act of returning directly to his streetcar in compliance with and in fulfillment of his duty to take it out on a run scheduled to begin within a few minutes, he was then actively engaged in the prosecution of his master's business within the rules governing the doctrine of respondeat superior.

Defendant's next contention is that "there was no substantial evidence in the case to support the negligence submitted by plaintiff * * * on the failure of George Hellmann to keep a 'proper and adequate lookout.'" Defendant's argument runs this wise: "We do not believe that a *pedestrian* case is governed by the legal issues and elements as those that are sufficient to make a submissible case where a motor vehicle operator is charged with failure to keep a proper and adequate lookout. The cases dealing with motor vehicles seem to consider it sufficient to allege and submit to the jury the ultimate fact of 'failure to keep a lookout.' * * * There are [however] fundamental differences between motor vehicle cases and pedestrian cases which afford compelling reason to require additional elements and proof thereon to be elicited before a submissible case is made on failure to keep a proper and adequate lookout in pedestrian cases. * * * In the case of the motor vehicle driver, the duty to keep a lookout is fixed, uniform, continuous and constant, * * * but in the instance of the pedestrian no such compelling duty is necessary. * * * Plaintiff introduced no evidence which would directly establish, nor from which it could be reasonably inferred, that Mr. Hellmann was *not* keeping a proper and adequate lookout based on the above essential requirements which afford the criteria as to whether George Hellmann's conduct amounted to negligence or not."

Strangely, defendant cites in support of that contention the case of Burke v. Stix, Baer & Fuller Co., Mo.Sup., 264 S.W.2d 337. In that case a customer in defendant's cafeteria was engaged in carrying a tray of food to a table when defendant's waitress, carrying a tray, stepped backward with her

left foot and in so doing her left heel came upon and injured plaintiff's right foot. In disposing of a contention there made similar to that here made, it was said, loc. cit. 339: "If we keep in mind that defendant's place of business was a cafeteria where patrons carried trays of food to tables, and that plaintiff was in the aisle where patrons walked, we conclude that the employee should have known that if she stepped backward without looking, she might come into contact with a patron. We are of the opinion that the evidence was sufficient to require the submission of the question of negligence to a jury. Hughes v. St. Louis National League Baseball Club, 359 Mo. 993, 224 S.W.2d 989, loc. cit. 993(6–8), 16 A.L.R.2d 904; Salmons v. Dun & Bradstreet, 349 Mo. 498, 162 S.W.2d 245, 141 A.L.R. 674."

▮▮▮ Plaintiff herein, as the customer in the above case, was an invitee upon defendant's premises. The defendant owed her the comon law duty to exercise ordinary care to avoid injuring her while she was there. Burke v. Stix, etc., supra; Chisholm v. Berg, Mo.App., 78 S.W.2d 486; Heine v. John R. Thompson Co., Mo.Sup., 330 S.W.2d 867, 868. Except as otherwise declared by statute (such as in the case of operators of motor vehicles upon the public highways), the degree of care required of a pedestrian is precisely the same as the common law duty of a traveler by any means of locomotion whatsoever, to wit: that of ordinary care. "Ordinary care" is a relative term and its exercise requires such precautions as are commensurate with the dangers reasonably to be anticipated under the circumstances. Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S.W.2d 223, 228; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601, 609; Tharp v. Monsees, Mo.Sup., 327 S.W.2d 889, 893; Reese v. Illinois Terminal R. Co., Mo.Sup., 273 S.W.2d 217, 221. In the instant case the evidence showed the loop to be a busy place, with employees and invitees walking in all directions. Obviously, collisions between them were inevitable unless each ex-ercised ordinary care not to collide with others. The only conceivable way in which to exercise such care is by way of lookout. The evidence favorable to plaintiff showed that as she walked in a normal manner for some distance directly toward the bus, she was struck from the rear by Hellmann. Surely, under those circumstances, the fact that Hellmann never saw plaintiff before running into her, in and of itself, warrants an inference of his failure to keep a lookout. The evidence made a jury issue of the failure of defendant's servant to exercise due care.

Defendant challenges the propriety of plaintiff's submission Instruction No. 1 on five different grounds. The portion of the instruction necessary to a determination of the charges leveled against it reads as follows:

"* * * and if you further find that while plaintiff was walking toward said bus as aforesaid, if you so find, she was at all times in the exercise of ordinary care for her own safety, and that one of the servants of defendant, acting in the scope of his employment by defendant, if you so find, then and there was a pedestrian moving over and along the premises of said 'Wellston Loop' for the purpose of going to a streetcar which he was operating for defendant, and that, while he was so doing, he collided with plaintiff, and that, as a direct result of such collision, plaintiff was caused to fall to the ground or pavement there and to be injured; and if you further find and believe that said servant of defendant then and there failed to keep a proper and adequate lookout for other persons moving in and upon said 'Wellston Loop,' particularly plaintiff, and that in so failing, if you so find, said servant of defendant failed to exercise ordinary care and was negligent; and if you further find and believe that the aforesaid collision and injury to plaintiff directly and proximately resulted from the aforesaid negligence of said

servant of defendant (if you find that said servant of defendant was negligent as aforesaid), then your verdict herein must be in favor of the plaintiff," etc.

■ The first contention is that there are two repugnant theories as to how the collision occurred and that the instruction permitted a verdict for plaintiff irrespective of which theory the jury believed. It is true that there were two completely divergent views as to the manner in which plaintiff and Hellmann collided. Plaintiff's evidence tended to show that as she walked *northeastward* from the *northwest* corner of the White Mill directly *to the right front entrance of the Ferguson bus* she was struck in the back from her left side by Hellmann and caused to fall to the pavement. Defendant's evidence tended to show that as plaintiff walked *northwestward* from the *east side* of the White Mill building toward the Ferguson bus she struck Hellmann's right shoulder, presumably from the rear, as he stood facing north. Thus, the essential and basic fact issue in that respect was, therefore, not at what precise point on the loop the collision occurred but rather, to state the matter simply, *which ran into the other*. The instruction specifically hypothesized as one of the conditions necessary to recovery by plaintiff that the jury find that as he walked to the streetcar, Hellmann *"collided with plaintiff."* That language is plain and means precisely what it says. It cannot be tortured into authorizing a finding for plaintiff if the jury should believe that *plaintiff collided with Hellmann*. Consequently, the instruction, in the respects above considered, is correct. Had defendant desired a more detailed hypothesization of either the facts in evidence upon which plaintiff predicated her right of recovery or the facts in evidence upon which defendant sought to defeat recovery, it could have offered and sought the giving of proper instructions to that effect. The record shows, however, that defendant offered no instructions other than cautionary ones couched in general terms, all of which

were given. The contention must be denied.

■ The second contention is that the instruction erroneously omitted any finding that Hellmann knew or, in the exercise of ordinary care, should have known that plaintiff was in close and dangerous proximity to him, citing Burke v. Stix, Baer & Fuller Co., Mo.Sup., 264 S.W.2d 337, cited supra. That case does not help defendant. It unequivocally held that a waitress in a cafeteria, where customers were carrying trays of food, should know that if she stepped backward without looking she might come into contact with a patron. So we well might say in this case that when Hellmann walked in the loop, where, as he admittedly knew, many of defendant's invitees walked in all directions, he also knew or, in the exercise of ordinary care, should have known that if he walked heedlessly without maintaining a proper lookout he might collide with one of them. The petition in our case alleged that defendant's servant "while proceeding through the aforesaid loop as aforesaid, carelessly and negligently failed and omitted to keep a lookout for other people, particularly plaintiff," etc. Likewise, the instruction expressly hypothesized, as a condition precedent to plaintiff's right of recovery, a finding of (1) the failure of Hellmann to keep a proper and adequate lookout for persons moving upon the loop and (2) the further finding that his failure in that respect amounted to want of exercise of ordinary care. Both the pleading and the instruction were adequate in that respect. Nelson v. Evans, 338 Mo. 991, 93 S.W.2d 691, 693; Horrell v. St. Louis Public Service Co., Mo., 277 S.W.2d 612, 614; Anthony v. Morrow, Mo.App., 306 S.W.2d 581, 588; Moore v. Ready Mixed Concrete Co., Mo., 329 S.W.2d 14, 25. The contention is denied.

■ The third and fourth contentions are, respectively, that the instruction: (a) erroneously allowed a verdict for plaintiff "on the bare finding that a collision occur-

red and Mr. Hellmann was not keeping a proper and adequate lookout"; and (b) erroneously required Hellmann to keep a "proper and adequate lookout," thereby placing on defendant the absolute duty to prevent the collision, "while the law requires defendant to use only ordinary care." The answer to both assertions is that they are not true. Nowhere in the instruction can there be found any statement which reasonably may be interpreted as a declaration that there was any absolute duty on the part of Hellmann to keep such a lookout as would prevent a collision. As a matter of fact, the instruction does not *in terms* define his duty with respect to any sort of "lookout". What the instruction says in that respect is, in substance, that if Hellmann collided with plaintiff and injured her, she was entitled to recover if: (1) Hellmann "failed to keep a proper and adequate lookout"; (2) that in so failing, he *"failed to exercise ordinary care and was negligent"* (the words "negligence" and "ordinary care" having been properly defined in another instruction given); and (3) that plaintiff's injuries directly and proximately resulted from negligence. While we do not commend use of the words "adequate and proper" in describing "lookout" for the reason that the indiscriminate use of such words *in defining in terms the extent of one's duty to keep a lookout* could easily lead to error, yet, as they were employed and explained in the foregoing instruction, they were not erroneous or misleading.

The fifth contention is that the instruction erroneously assumes a fact in dispute in the use of the clause "for the purpose of going to a streetcar which he (Hellmann) was operating for defendant," to wit: the fact issue of whether Hellmann was employed by defendant or was acting within the scope of his employment at the time of the collision. We think that clause, considered in the light of the facts in the case and in connection with another portion of the instruction, could not have been misleading. The phrase "a streetcar which he

was operating for defendant" was obviously used merely as a means of identification of the streetcar to which Hellmann was returning. There never was any actual issue as to Hellmann's being defendant's employee *in charge of the operation of that streetcar*, as that term is used in a general sense. The real issue was whether Hellmann was on duty and acting within the scope of his employment as he was returning to that car. The jury well knew that that issue did not depend or in any manner turn upon actual physical operation of the streetcar at the time of the collision. They knew that that issue, as the instruction clearly hypothesized, turned upon whether they found that "one of the servants of the defendant (Hellmann), acting in the scope of his employment by defendant, if you so find, then and there was a pedestrian moving over and along the premises of said 'Wellston Loop' for the purpose of going to a streetcar which he was operating for defendant, and that, while he was so doing, he collided with plaintiff, * * *." When the jury found, as its verdict demonstrates it did, that Hellmann was acting in the scope of his employment when he, moving as a pedestrian to the streetcar, collided with plaintiff, it necessarily found that he was on duty in the course of his employment by defendant in the operation of the streetcar. The contention is hypercritical and without merit.

The final matter for consideration is the alleged excessiveness of the verdict. A careful reading of the evidence with respect to the nature and extent of plaintiff's injuries, all of which was adduced by plaintiff, and the summaries of the evidence in that regard as made by each of the parties, shows no dispute that her injuries were and will remain gravely disabling and painful. Plaintiff was 46 years old at the time she was injured. She previously had been in good health, free from pain, with full use of all her faculties. As a result of the collision, she sustained a subcapital fracture of the neck of the right femur, with displacement distally and posteriorly of the head of

the femur in relationship to the neck thereof. An open reduction of the fracture was had by surgery under general anesthesia. After an unsuccessful attempt to fix the fracture with a Key nail, a Smith-Peterson nail was inserted in the neck and head of the femur and a Thurston plate attached in an effort to hold the fragments in proper position, but the fragments subsequently "slipped" so that there was a resultant approximately 50% subluxation, or displacement, of the head of the femur at the acetabulum. In addition, the Smith-Peterson nail projected into the soft tissues and the acetabulum, which, together with the displacement of the femur head, produced a secondary degenerative arthritis of the femur head and acetabulum, of marked degree, manifested by new bone deposit. A second operation was performed, almost a year after the first one, for the removal of the Smith-Peterson nail.

Plaintiff has never been able to walk without crutches, or a crutch, since December 28, 1956. She has a great restriction in the movement of her hip, has difficulty not only in ordinary walking, but in getting down stairs. She cannot bend over so as to put on her right shoe. She walks with a marked limp, and with the assistance of one crutch. She suffers stiffness, muscle spasms and pain in her right hip joint and upper leg, with secondary swelling, pain and weakness in her right leg and ankle, and all motions of her right hip are markedly limited and painful; she stands abnormally, with her right foot rotated externally, and with both the knee and hip joints flexed. She wears on her right foot a "built-up" shoe prescribed by her orthopedist. Her disabilities and resultant pain are progressive and are permanent. The result of treatment for her injuries has been unsatisfactory (the operations upon her were "a total loss") and she will require further major surgery for excision of the femoral head and replacement of it with a metallic prosthesis. By the time of the trial below, plaintiff had lost so much

weight that one of defendant's witnesses "hardly recognized her."

Counsel for the parties have furnished us with numerous cases in support of their respective and conflicting contentions as to the alleged excessiveness of the judgment of $30,000 entered upon compliance with its conditional order of remittitur. We think neither would contend any of them is very illuminating or helpful; as, of course, so often is the case in consideration of reasonable uniformity of just compensation for personal injuries. The injuries above narrated bespeak their own gravity. Taken at face value, they reveal that plaintiff is permanently crippled and henceforth will suffer extensive permanent physical disability and suffering. The extent of any benefit she may experience from the future major surgery which she must undergo is unknown; it is at best "a substitute for the real thing."

An experienced trial judge gave this matter his consideration after hearing the testimony and observing plaintiff and her witnesses during the trial. He reduced the verdict by 25 per cent. Certainly, we do not think $30,000, as fixed by him, grossly or shockingly excessive; and defendant has advanced no convincing argument that it is in fact excessive. In Bone v. General Motors Corp., Mo.Sup., 322 S.W.2d 916, when confronted with a similar situation, this court said what we think apropos and justly dispositive of the instant contention, loc. cit. 925: "The scope of review of verdicts by the trial and appellate courts is ably discussed in the case of Sanders v. Illinois Central R. Co., Banc, 364 Mo. 1010, 270 S. W.2d 731. Attending thereto, we look to see whether the evidence, considered in a light most favorable to the action of the trial court, affords reasonable and substantial support for the amount of the judgment and for the trial court's remittitur. We have concluded that it does."

The judgment is affirmed.

All concur.