Pamela Sue **PEAK**, by her father and next friend, Francis Wilber Peak, Plaintiff-Respondent,

v.

**W. T. GRANT COMPANY,**
Defendant-Appellant.

No. 24102.

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1964.

Motion for Rehearing or Transfer to Supreme Court Denied Feb. 1, 1965.

Application to Transfer Denied
March 8, 1965.

Rodger J. Walsh, Rafter, Biersmith, Miller & Walsh, Kansas City, for appellant.

Wilbur L. Pollard, Williams, Norton & Pollard, North Kansas City, for respondent.

HUNTER, Judge.

This is an action for false arrest and imprisonment. Pamela Sue Peak by her father and next friend, Francis Wilber Peak, obtained a verdict and judgment for $2,500 actual damages and $4,000 punitive damages against defendant-appellant W. T. Grant Company, a corporation.

■ On this appeal the W. T. Grant Company has charged the trial court with having erred in failing to direct a verdict for defendant, in admitting into evidence plaintiff's Exhibit No. 3, in giving plaintiff's Instruction No. 3, and in not setting aside the verdict on the ground it is excessive. We will proceed to set out only such of the evidence as is pertinent to the proper disposition of these contentions of error. In determining whether defendant was entitled to a directed verdict we view the evidence in its most favorable light to the plaintiff, as is the rule.

The incident involved occurred on Saturday afternoon, December 15, 1962, in defendant's store located in the Antioch Shopping Center in Kansas City North, Clay County, Missouri. The Grant Store was about 200 feet by 400 feet in size on the ground floor and it has offices on a lower or basement floor. That day was the largest selling day before Christmas and the store was very crowded with some 400 customers and 52 employees being present. Kenneth Burton was the store's manager and Terry Knapp was the store's floor supervisor.

Plaintiff (hereinafter referred to as Pam) who was then sixteen years old, together with her mother, her sister Candace (Candy) then thirteen years old, and her brother Tim, then twelve years old arrived at the shopping center about 2:30 p. m. to do their Christmas shopping. The children had $5.00 apiece for this purpose. They decided to separate so they could make purchases without revealing what they were purchasing for each other. Pam's mother went to the Crown Drug Store. Pam went

to the T. G. & Y. Store and Candy and Tim went to Grant's.

Mrs. Howard, an employee of Grant's for seven years, saw Candy near a rack of clothing in her department. Candy had a "clutch" purse and according to Mrs. Howard "she couldn't get it closed, it was so full." * * * "I didn't see her put anything in her purse; I saw her working with her purse, trying to get it closed." It appeared Candy was trying to push down the contents of her purse so she could close it.

Mrs. Howard testified she walked up to help Candy and Candy's face got red, she appeared frightened and left hurriedly toward the other end of the store. "And she didn't get it (purse) closed when she left the department." Mrs. Howard pointed out Candy to Knapp and told him she thought Candy might be putting something in her purse. Knapp was watching for shoplifters that day. He started watching Candy and noticed she was carrying a very full purse. After watching her three or four minutes he saw a Mr. Stawicki, a part time security officer for the Antioch Shopping Center Merchant's Association whose duties included assisting the Association's members, including Grant's in apprehending shoplifters. He signaled Mr. Stawicki, and the two of them endeavored to follow Candy and her brother as they went in and out the isles to some six or seven counters. Knapp described Candy's actions in darting in and out of isles as "evasive" and to him suspicious. Finally Candy and her brother went under the railing beyond the check stand to the door. Knapp then told Stawicki to stop Candy and he did so. Stawicki showed her his card credentials, told her he was the security officer for the Shopping Center and said he wanted to speak to her because she was suspected of shoplifting. According to Stawicki the purse was still very full and he asked to see it. She held onto it. He asked her to follow him and she did. They all went to the northeast corner of the store.

Tim told Candy to show her purse but she continued to hold on to it. Tim then left to go get Pam who by then had left the T. G. & Y. store and had entered Grant's store.

Tim returned with Pam. According to Pam, "I went in between the two men to my sister, and Tim went around them over to her. I * * * asked them what they wanted." Stawicki told Pam he wanted to see her sister's purse. Pam wanted a uniformed police officer and Knapp asked Stawicki to get one. He left to do so, and Knapp wanted Pam and Candy to go to the basement.

Knapp took hold of Candy's arm. "I (Pam) told him to leave her alone." * * "I took her by the hand and told her that we'd go get Mom." Knapp ordered her to stay until the officer arrived. "He (Knapp) took hold of my coat * * * with both of his hands. * * * Well, I told him I'd scream, and he started shaking me. * * * Well, I screamed, and he threw me around into a—rack of clothes. * * * It was pushed 'way back into the other racks (her lower back struck it). * * * I had the box that I got—the airplane for Timmy—and I hit him in the side of the head with it (and repeatedly kicked him on the shins)." Tim left to go get his mother.

Pam continued to scream and Knapp tried to cover her mouth. He dragged her by the arm across the store to a big safe located near the stairway to the basement offices. According to one witness, Knapp was slapping Pam and knocking her into several counters as he dragged her along toward the basement steps. In the process a little boy was knocked down and a crowd of some forty or more gathered. Until this time neither Knapp nor Stawicki had identified themselves to Pam. They were not in any type of uniform.

Grant's manager, Mr. Burton, arrived as did Pam's mother and Tim. Mr. Stawicki then returned with a police officer. Upon

learning about the fracas Pam's mother took Candy's purse and gave it to Stawicki. Upon examination by Stawicki with the others looking on it was determined that the purse contained only the usual articles that young girls customarily carried and did not contain anything that belonged to Grant's. Stawicki and Knapp testified the purse opened to be much thinner than when earlier observed by them. Knapp stated he had not seen Candy for a short while before her mother arrived but conceded that he had not actually seen her leave the group. Candy in her testimony denied she had ever left the area, denied her purse was any thinner and denied she had taken anything at Grant's.

Pam, her mother, Candy and Tim then left the store, and Pam was taken to a doctor. Her injuries will be discussed later.

On this appeal defendant contends the trial court erred in failing to direct a verdict for defendant because plaintiff failed to prove defendant's employee, Mr. Knapp, was acting within the scope of the authority conferred upon him and failed to make a submissible case on the question of agency. Knapp testified without objection that he was defendant's floor supervisor at the Grant store and that one of his duties was to watch for and apprehend shoplifters. Knapp described the large number of shoplifters that he and other employees at Grant's had apprehended in the past and after this incident and stated that most of them were teenagers. He told how defendant Company gave him written instructions on shoplifters in the store—what to do with them—what procedure to follow. "Q. Did you follow the store's procedure? A. Yes, sir. Q. Now, this procedure was taught to you by whom? A. Mr. Burton. Q. And was it part of your training? A. Yes, sir, it is part of the training. Q. * * * This Saturday—were you watching for shoplifters that day? A. Very much so, yes. Q. And that's part of your job every day isn't it?—Watching for shoplifters? A. Yes, sir, it is; every day." Testimony from Mr. Burton corroborates that it was a part

of the manager and assistant manager's duties to watch for and apprehend shoplifters and to protect the company's property.

Defendant's written directive (plaintiff's Exhibit No. 3) provided in part, "Never detain a person on uncorroborated word of saleswoman or customer as they may be mistaken * * *." * * * "Before anyone is detained and brought back to store be sure that there is not any doubt of guilt, for once arrest is made, withdrawal of charge cannot save company from liability. * * *

"Never cause an arrest unless evidence is so strong that conviction is inevitable. It is better that a guilty shoplifter be allowed to escape justice occasionally rather than subject Company to suits for false arrest. * * *" Defendant's specific contention is that since Knapp's actions were based upon what the clerk told him he exceeded his authority as set out in plaintiff's Exhibit No. 3 and therefore this defendant is not liable for his actions and especially is not to be subjected to punitive damages.

The liability of a principal for a wrongful restraint or detention by an agent or employee depends on whether the act was authorized or subsequently ratified, or whether the act was within the scope of the agent's or employees employment or authority. 35 C.J.S. False Imprisonment § 40(1), page 687. Thus, the defendant is liable for the wrongful arrest and detention of plaintiff only if its employee, Mr. Knapp, in so doing acted within the scope of his authority, express or implied. Heinold v. Muntz T. V., Mo.Sup., 262 S.W.2d 32.

In Knowles v. Bullene & Co., 71 Mo. App. 341, this court held that the employer of a large department store was liable in an action for false arrest and imprisonment of a person arrested by his floorwalker for stealing lace from a counter although the employer had instructed his employees not to arrest unless they actually witnessed the act and the floorwalker had not seen the

act of stealing but acted on another employee's report of seeing it. In so holding this court said, loc. cit. 348: "These principles are applicable to the case at bar. These servants or agents of the defendants were put in charge of goods held for sale; their primary duty of course was to make sales, but they were likewise relied on to protect the goods from pilfering, and to do this, were authorized, as the principals themselves might have done if present, to arrest and search parties for the purpose of recovering stolen goods. If, however, in the performance of this duty the defendants' employees mistook the occasion for it and arrested and searched an innocent party, still the employers are responsible. It would be wrong and contrary to legal principles to visit the mistakes of these agents upon third parties, where as here such agents were acting within the general scope of the business intrusted to them by the principals.

■ "Neither will this liability be shifted and defendants relieved, because, as testified by defendant Thayer, he cautioned his employees to make no arrests except in cases where they actually saw the theft committed. Innocent third parties can not be affected by these instructions which were disobeyed by the defendants' servants. Garretzen v. Duenckel, 50 Mo. 104; Farber v. [Missouri Pacific] Railway, 32 Mo.App. 378; Jones v. [St. Louis, N. & P.] Packet Co., 43 Mo.App. 398. In these and numerous other cases that might be cited, it is in effect held that the master will be liable where the act was done by the servant in the scope of his employment, and to accomplish the purpose of that employment, although it was done contrary to the express orders of the master. 'The test of a master's responsibility for the act of his servant is, whether the act was done in the prosecution of the master's business, not whether it was done in accordance with the instructions of the master to the servant.'" And see, Nichols v. Chicago R. I. & P. Ry. Co., Mo.App., 232 S.W. 275, 277.

In Sacks v. St. Louis & S. F. R. Co., Mo., 192 S.W. 418, 420, our Supreme Court expressed it, "Corporations sometimes appoint persons with power to act generally in detecting, arresting, and prosecuting offenders against the law as it affects their rights. In such cases the employer is held responsible for the acts of the agent within the general scope of his employment, and in furtherance of the master's business, although the agent may have violated the master's instructions."

■ Thus it is the rule that the employer or principal is liable for a wrongful restraint or detention by an employee or agent within the scope of his employment even though the act was contrary to express instructions, and even though the agent or employee was guilty of negligence or of malicious conduct. 35 C.J.S. False Imprisonment § 40(3), page 690; Titus v. Montgomery Ward & Co., 232 Mo.App. 987, 123 S.W.2d 574, 575; 22 Am.Jur., False Imprisonment, Section 37, pages 378–79.

■ If there is any uncertainty arising as to whether the employee is acting within the scope of his authority arising either from a conflict in the evidence or because the undisputed facts might lead reasonable men to draw different conclusions then the question is one of fact to be determined by the jury. De Mariano v. St. Louis Public Service Co., Mo.Sup., 340 S.W.2d 735; Salmons v. Dun & Bradstreet, 349 Mo. 498, 162 S.W.2d 245, 141 A.L.R. 674.

■ In the instant case the evidence discloses Knapp was authorized to arrest and detain shoplifters. By his own testimony he had done so on many prior occasions and he continued to do so since this incident. In fact defendant's written directive gave him cautionary instructions concerning the arresting of shoplifters. There is some doubt as to whether the particular sentence, "Never detain a person on uncorroborated word of saleswoman or customer as they may be mistaken * * *" applies to a manager, assistant manager or

to a person of Mr. Knapp's particular position rather than to a mere employee. In its brief defendant discusses its right to detain Candy as though she were the plaintiff in this suit. If this were so, Knapp would not have violated his written instructions for he had not only what the saleslady reported about Candy but additionally he had followed Candy, observed as he described it, her stuffed purse, her furtive movements and actions and then undertook to detain her as she was leaving the store. However, this suit is by Pam, not Candy, and as to her even though Knapp may have violated the defendant's written directive, his wrongful restraint of Pam could nonetheless be found by the jury to be within the scope of his employment and defendant legally responsible for it. It was a question of fact to be determined by the jury. The trial court did not err in refusing to direct a verdict on the scope of employment question and in submitting that issue to the jury.

■■ Defendant also contends the rule is that the master must have participated in the conduct or acts relied on as a basis of punitive damages, or previously authorized or subsequently ratified them. The defendant is a corporation. It acts through its officers, agents and employees. When one of its employees is authorized to arrest and detain shoplifters, and in endeavoring to do so mistakenly arrests and detains an innocent person the defendant is liable therefor, and, if the employee's act of arrest and detention meets the usual tests of legal malice, then punitive damages as well as actual damages may be obtained. The rule is the same as applies to the commission of any other tort by an employee and the employer is sued for actual and punitive damages. See, Newport v. Montgomery Ward & Co., 344 Mo. 646, 127 S.W.2d 687; McGill v. Walnut Realty Co., 235 Mo.App. 874, 148 S.W.2d 131; Hutchinson v. Sunshine Oil Co., Mo.App., 218 S.W. 951; Titus v. Montgomery Ward & Co., supra, 123 S.W.2d loc. cit. 574.

Did the trial court err in admitting into evidence plaintiff's Exhibit No. 3, the defendant's Operation Manual on Shoplifting, over defendant's objection?

Defendant's counsel was the first to inject into the trial the subject of defendant's written instructions on shoplifting. He asked Knapp, "And, by the way, have you gotten instructions on shoplifters in the store—what to do with them and what procedure to follow? A. Yes, sir, we have. Q. And have you ever, before this incident—had you ever stopped a shoplifter in the store. A. Yes, sir, quite often. Q. And I suppose you've stopped them since this incident, have you. * * * A. I would say approximately thirty or forty * * *. Q. And what's the procedure after you stop a shoplifter over there in the store? A. We take them to the office, and they generally talk to Mr. Burton; and we call their parents and have them come and take the child home for correction. Q. And is that the procedure that the Company has advised you to take? A. Yes, they have." * * * "Q. Well, you've testified, here, that you were instructed by the management on what procedures to follow; is that right? A. Yes, sir. Q. Did you follow those procedures? A. Yes, sir." * * * "MR. WALSH: Well, I asked him if he followed the store's procedure, and he says he did I think that's admissible. THE COURT: Proceed with your examination. BY MR. WALSH: Q. Did you follow the store's procedure? A. Yes, sir. Q. Now, this procedure was taught to you by whom? A. Mr. Burton. Q. And was it part of your training? A. Yes, sir, it is part of the training." * * (Mr. Pollard) "Now, then, there's no question but what you, in your capacity as floor supervisor and manager trainee, have received directives from the home offices at New York as to how you are to handle shoplifters; isn't that correct? A. General outlines; yes, sir. Q. And you received such memorandums and directives prior to December 15, 1962; is that correct? A. Yes, sir, I did." * * * "Q.

Now, then, Mr. Knapp, in the procedure you followed in apprehending and detaining Pam's little sister, Candy, you were following the directive from the home office in New York as evidenced in plaintiff's Exhibit No. 3; isn't that correct? A. Trying to; yes, sir."

■ Plaintiff's Exhibit No. 3 as it concerned shoplifting instructions and procedure was material to the issue of Knapp's authority. It was also material to the issue of punitive damages. Further, it was originally brought into the case through defendant's counsel who asked questions concerning it. Although the exhibit contained some material other than that concerning shoplifter procedure, none of that material was read to the jury or otherwise referred to in the presence of the jury. While such extraneous material was immaterial and should not have been included in the exhibit, we are convinced that under the present circumstances, even if it had come to the attention of the jury, it is not of such a nature as to prejudice the jury so as to constitute reversible error. We find no merit in this contention of defendant.

Plaintiff's Instruction No. 3 reads: "The Court instructs the jury that if you find and believe from the credible evidence in the case that on December 15, 1962, that the witness Knapp was agent for, and at all times mentioned herein was the agent of, Defendant W. T. Grant Company, and acting for and on behalf of the defendant and within the scope of his employment, if you so find, and if you further find that as such agent on such day he forcibly detained the plaintiff, Pamela Sue Peak, if you so find, and if you further find that the acts and conduct of such agent were willful, wrongful, malicious, and when he did not have reasonable cause to detain plaintiff, if so, the plaintiff is entitled to recover such actual damages as the jury may find and believe from the evidence will compensate plaintiff for her physical injuries, emotional upset, mental anguish, humiliation and embarrassment, if any, as a direct and proximate result of the acts and conduct of defendant's agent aforesaid.

"The Court further instructs the jury that if you find for plaintiff for actual damages, you may assess punitive damages as a punishment to defendant for such wrongful and malicious acts, if so, as a punishment to the defendant and as a warning to others."

Defendant charges four errors in the instruction. The first two are (1) that it failed to state the specific wrongful acts of defendant's employee that would serve as the basis for assessing punitive damages or actual damages and failed to tell the jury what constitutes "wrongful acts"; and, (2) that it failed to require a finding that any specific wrongful conduct of defendant's employee was willful, wanton or malicious.

■ As we read the instruction the wrongful acts were those consisting of the forcible detainer of Pam. If the jury found there was a forcible detainer of Pam and that such forcible detainer was willful, wrongful and malicious and without reasonable cause then it could proceed to assess the mentioned damages. While this portion of the instruction is no model we do not think it misled the jury; nor did it misdirect them.

The third charge of error is that the instruction failed to negate the affirmative defense that defendant had reasonable grounds or probable cause to believe that its merchandise was being stolen and that the detention was in a reasonable manner and for a reasonable length of time.

■ In 1961 our legislature enacted a statute establishing the mentioned affirmative defense. Section 537.125 RSMo 1959, V.A.M.S. However, the right to reasonably detain provided by the statute applies to the detention of "a person (who) has committed or is committing a wrongful taking of merchandise or money from a mercantile establishment * * *." De-

fendant Grant Company is not entitled to the benefit of this statute in a suit brought by this plaintiff, for defendant concedes that it never suspected her of taking or attempting to take its property. It was plaintiff's sister whom defendant suspected and that at a time when plaintiff was not even present in the store. The statutory defense would be available to defendant in a suit against it by Candy but not in this suit by Pam. Thus, even if plaintiff's verdict directing instruction failed to properly either negate the statutory affirmative defense or to clearly refer to defendant's Instruction No. 4 containing it, a matter on which we need not pass, such failure is not erroneous for defendant was not entitled to the defense or the instruction containing it in this suit by Pam.[1]

■ Defendant's last contention of error concerning Instruction No. 3 is that it failed to require a finding of agency as to any specific wrongful act of defendant's employee. What we have previously said disposes of this contention. The wrongful act contained in the instruction was the forcible detention of Pam by Knapp. The instruction requires the jury as a prerequisite to finding for plaintiff to find that Knapp "at all times mentioned herein was the agent of, Defendant W. T. Grant Company, and acting for and on behalf of the defendant and within the scope of his employment * * * and that as such agent on such day he forcibly detained the plaintiff * * *." We find no merit in this contention of defendant.

■ Defendant's final contention is that the trial court erred in entering judgment on the verdict because it was excessive. Plaintiff is entitled to recover general damages for all injuries sustained by her nat-

urally and proximately from her wrongful detention. This includes, among others, such items as mental suffering, humiliation, disgrace, injury to feelings and reputation as well as physical injury. Jarrett v. St. Francois County Finance Co., Mo. App., 185 S.W.2d 855; Oliver v. Kessler, Mo.App., 95 S.W.2d 1226.

■ There is evidence that Pam was wrongfully detained for almost an hour. A sizeable crowd, including some of her acquaintances, witnessed her detention and the accompanying fracas. Pam's injuries consisted of pain in the scapula area, discomfort in the left chest area, some pain and possible disability in her back, some bruising and emotional and mental upsets, sleeplessness, and nervous tension of a prolonged nature. She visited and was treated by Dr. Bates five or six times and had two visits with Dr. Meyers, a psychiatrist. While the verdict for actual damages in the sum of $2,500 may be viewed as liberal it is not unreasonable and was supported by the evidence.

■ The chief purpose of punitive damages, as its name implies, is to inflict punishment, and this for the reason the punishment assessed will serve as an example and deterrent to anyone considering similar conduct. Included in the numerous factors the jury may consider in determining the amount of punitive damages to be assessed are the degree of malice, the age, sex, health and character of the injured party and the affluence of the tort feasor. State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351. Because of the variegated nature and number of the factors that may be taken into account there is no precise rule that can be applied with mathematical nicety to de-

---

1. As to the correct way to negate an affirmative defense, see, Edwards v. Mellen, Mo.Sup., 366 S.W.2d 317; Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14; Prevost v. Wilkin, Mo.App., 358 S.W.2d 417, and M. F. A. Cooperative Ass'n of Mansfield v. Murray, Mo. App., 365 S.W.2d 279. The best form is set out in the proposed Missouri Approved Jury Instructions, No. 23.04 on false imprisonment, which provides, "Unless you believe plaintiff is not entitled to recover by reason of Instruction No. —— * * *."

termine the amount of punitive damages. Each case must turn on its own peculiar facts.

On the punitive damage issue, the evidence was that defendant operated 1,087 stores and that its past year's net profits were $9,004,122. This evidence along with the evidence bearing on legal malice and other relevant factors was for the jury's consideration in determining whether and in what amount it should award punitive damages.

The established rule is that the amount of punitive damages lies wholly within the sound discretion of the jury, if it sees fit to award them, and unless it plainly appears that there has been an abuse of this discretion, a court is not justified in interfering with an assessment of puni-tive damages. Wehrman v. Liberty Petroleum Co., Mo.App., 382 S.W.2d 56; Menke v. Rovin, 352 Mo. 826, 180 S.W.2d 24, 28.

Ordinarily the abuse of discretion mentioned means the verdict must be so out of all proper proportion to the factors involved as to reveal improper motives or a clear absence of honest exercise of judgment by the jury. See, Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W. 2d 1083, 1089.

After considering the evidence on the punitive damage issue, we are not persuaded that the jury abused its discretion in naming the amount it did, and the trial court did not err in entering judgment in accordance with the jury's verdict.

The judgment is affirmed.

All concur.