**John ROTERT and Elizabeth Rotert, Respondents,**

**v.**

**PEABODY COAL COMPANY, a foreign corporation, Appellant.**

**No. KCD 26217.**

Missouri Court of Appeals, Kansas City District.

July 1, 1974.

Motion for Rehearing and for Transfer Denied Aug. 5, 1974.

Application to Transfer Denied Oct. 14, 1974.

---

Robert S. McKenzie, Kansas City, for appellant; McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, of counsel.

Edward J. Murphy, Inc., Butler, for respondents.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

PRITCHARD, Presiding Judge.

Respondents recovered judgment against appellant for blasting damage and nuisance occurring during its strip coal mining operations adjacent to respondents' dwelling which was upon a ten acre tract of land. Of the various issues presented the one most vigorously contended by the parties is the propriety of submitting the issues of punitive damages, respondent Elizabeth Rotert's claim for emotional distress and resultant illness and her husband's claim for loss of her consortium by reason of her illness, because as claimed by appellant, there was no evidence that its blasting operations were conducted willfully, wantonly or maliciously.

The judgment entered was for $31,400.00 actual damages and $32,000.00 punitive damages on all counts, which was after a $3,000.00 remittitur was ordered and accepted by respondents because the jury on one count exceeded the prayer in that amount.

Under Count II, for property damage to buildings, the award was $8,000.00 actual damages. Under Count III, the award was $3,400.00 for actual damages in the loss of pigs, the raising of which was a business operation of respondents. Under Count IV, Elizabeth received an award of $4,500.00 actual and $9,500.00 punitive damages for her emotional distress and illness. Under Count V, John was awarded $5,000.00 actual and $22,500.00 punitive damages for his loss of Elizabeth's consortium and for her medical expenses. John was, in Count VI, awarded $500.00 actual damages individually for nuisance because of fumes and dust, and the deep pit left by appellant across the road from respondents' home; and upon the same theory both John and Elizabeth were jointly awarded $10,000.00 actual damages on Count VII.

Respondents say that Point I, which raises error of the court in submitting Elizabeth's claim for nervous and emotional illness; John's claim for loss of her services; in their claims for punitive damages, because there was no evidence that Elizabeth suffered any physical injury and that there was no evidence that appellant's actions were willful, wanton or malicious, was not preserved in its motion for new trial. A reading of paragraphs 25 and 26 of the motion shows that these issues were presented to the trial court and thus are preserved for review.

Appellant makes no claim that there was an insufficiency of evidence to show that it conducted blasting operations and that as a result there was damage to respondents' property located to the west of the strip mining operation. Appellant's real claim is that there was no evidence to support either the award for Elizabeth's nervous and emotional illness or John's award for his loss of her services, and the awards of punitive damages, because lacking is the element that appellant's conduct was under circumstances of malice, willfulness, wantonness or inhumanity.

The evidence concerning appellant's mining operation is this: It had a lease on land lying east of respondents' ten acre tract prior to the time respondents purchased it. The coal lay in two seams, each about 1 foot and 11 inches thick, and were covered by a limestone layer about 20 inches thick which was 30 to 35 feet below the surface. This limestone layer had to be removed to get at the first coal seam, and after the clay, "shell" overburden, was removed with a power shovel or a dragline, it was generally necessary to use explosive to dislodge the rock in an upward direction. For the explosive, about 40 holes were usually drilled vertically through the rock to a depth of from 12 feet to about 14 feet and spaced about 25 feet apart. In

each vertical hole there was placed one 25 pound bag of NCN (nitrocarbonnitrate, also referred to as ammonium nitrate and A.N.F.O.). Underneath the rock, holes, usually around 20 in number, were drilled horizontally to a depth of about 60 feet, which was the width of the trench from which coal was removed from each successive pit. The horizontal holes were spaced from around 15 feet to around 30 feet apart, and into each hole there was placed 10 to 15 25-pound bags of NCN. Fuel oil was used with the NCN, and dynamite and caps were used to initiate its explosion. A fuse line was used from the detonating device, and branches from it into a line in each hole, a delay mechanism was sometimes used to cause the explosions to occur $17/1000$ of a second apart.

Respondents first noticed appellant's blasting operation in 1968 at which time they talked to Shorty Powell, appellant's land man, about possible damage to their well. Later, as the mining operation moved closer, respondents noticed cracks appearing in the living and dining rooms of their home and Powell told them not to do anything to their home for 3 years. The mining operation continued toward their home, and blasting was occurring any time of the day or night, and Elizabeth started keeping a calendar log of some of the times the blasting was done, and of the severity of the explosions. She noted on the calendar dates the times of the explosions and their intensity, e. g., "hard", "very hard", "hardest yet" and "very, very hard." By months, the calendar describes these explosions, which when related to appellant's map showing dates and distances from appellant's property line to the trenches (computing distance by the map scale of 100 feet to the inch) show this approximate information: July, 1969, 4 explosions, when the strip was about 2,000 feet away; August 1969, 14 explosions, one hard, 1,850 feet away; September 1969, 6 explosions, 1,700 feet away; October 1969, 13 explosions, 3 very hard, 1,550 feet away; November 1969, 33 explosions,

1 hard, 6 "big shots", 1,450 feet away; December 1969, 34 explosions, 1,300 feet away; January 1970, 63 explosions, 10 hard, 2 very hard, 1,150 feet away; February 1970, 97 explosions, 15 hard, 20 very hard, 1,000 feet away; March 1970, 47 explosions, 15 hard, 13 very hard, 850 feet away; April 1970, 48 explosions, 16 hard, 9 very hard, 1 "hardest yet", 750 feet away; May 1970, 96 explosions, 2 hard, 47 very hard, 3 very, very hard, 600 feet away; June 1970, 87 explosions, 14 very hard; and on June 6, 1970, 3 very hard shots, and rocks fell from respondents' basement wall, 500 feet away; July 1970 (during which respondents were away for 9 days), 73 explosions, 23 hard, 10 very hard, 450 feet away; August 1970 (during which respondents were away 3 days), 37 explosions, 16 hard, 7 very hard, 350 feet away; September 1970, 85 explosions, 24 hard, 3 very hard, 300 feet away; October 1970, 66 explosions, 24 hard, 1 very hard —apparently about 1,000 feet to the northeast of appellant's property line in front of respondents' dwelling; on November 28, 1970, 3 days after suit was filed, there were 3 hard shots, about 250 feet from appellant's property line. Appellant stopped mining when it was 175 feet from its property line when ordinarily it would go to within 50 feet of the line. To the above distances, there should be added 125 to 175 feet, as the evidence variously shows, from the property line to respondents' dwelling. By Elizabeth's log on the calendar there were more than 800 explosions from July 1969, through December 1970, after which she got to the place where she could no longer keep the log. Appellant's records show far more explosions than Elizabeth recorded, but undoubtedly, since its mining trenches were running in a north-south direction, many were a sufficient distance away from respondents' home not to be noticed.

Elizabeth talked to Powell, Yates Storts and Howard Reddick, and to others of appellant's employees at the mine, and made more than a hundred calls to them about

the blasting as it got closer. They did not cut down on the shots until after she called appellant's president in St. Louis at his home at 12:30 a. m., on March 1, 1970, but even after that call there was really no change in the blasting being done. Upon complaint, Reddick would merely respond, "Okay, I will tell them," (according to Elizabeth, Reddick showed a terribly lot of indifference to respondents' problem) and Powell would say, "Those shots aren't that hard," and would argue that it was the humidity, not the shot. Never did they give respondents an answer that indicated appellant was going to do anything about the blasting, which got worse and worse as appellant got closer to respondents' home. Prior to the time suit was filed, there was no notice to respondents that there was going to be blasting, but sometimes they would hear the warning whistle in the pit.

Elizabeth was awakened many times at night by the blasting, and the family was awakened and she would have trouble getting the children back to sleep. She lost so much sleep that she "simply couldn't function any more"; she could hardly live with the blasting and became crabby, nervous and jumpy as did John. She took medication, and developed a lot of epigastric distress and an ulcer for which she took Maalox and ate a bland diet. She was hospitalized two weeks. The medical testimony is omitted from the record at appellant's direction, and no issue is made as to the cause or extent of Elizabeth's physical condition, but it is conceded that she suffered no direct physical injury or contact from the blasting (other than from vibrations and concussions).

The evidence of damage is not contested by appellant, except as to its claim that amounts awarded were "excessive and so excessive as to show bias and prejudice on the part of the jury" under its Point IV. In general, the evidence showed cracks in the plaster of the house, damage to the chimney, broken windows, damage to the basement walls and flue; cracking of a concrete floor of a pig farrowing barn, ne-

cessitating replacement, and from which little pigs developed E. Coli scours and died from a pathogenic strain of bacteria which built up in the cracks of the floor, and which could not be controlled by cleaning and disinfectant. There was also a kind of loosely packed, gritty dirt which blew over to respondents' house continuously when the wind was from the direction of the pits, which dirt stuck between the storm windows and the window and stayed there. In the fields there was a sulphur odor from the pits, and the water which built up in the pit was highly acidic. Elizabeth was in a constant state of worry lest her husband, who was blind, or her children would get into the pit.

Father Russell Friedricksen, parish priest at Germantown, lived 350 feet west of respondents. He became aware of appellant's blasting by sound and vibration in 1967, and thereafter it definitely increased in intensity. The blasting generally occurred between 4:30 and 4:45 in the afternoons. He talked to many individuals in the coal company personally and by telephone because of the personal inconvenience to him. From 1967 through 1970, he called Peabody 50 or 60 or more times, and did not observe any appreciable response, but the blasting at night occurred less frequently; and also upon a complaint the blasting might seem less severe; but within a short time, it would pick up again as far as the severity was concerned. There was a definite sulphur odor from the mine field when the wind was in the east.

Wilford and Joseph H. Putthoff lived one-fourth mile west of respondents. They noticed appellant's blasting in 1969, and "they just kept moving west and the further up they got, the heavier the blasting." It got the heaviest right in front of respondents' home. The whole Putthoff house would tremble when appellant would shoot in the evenings, and sometimes their livestock would become frightened and get up and run.

Mrs. Bill Lewis lived in a mobile home just south about two blocks from respond-

ents. She first noticed the blasting in 1969, sometimes every other night. It increased and was at its worst in 1970 when the mining was just across the road to the east. It would shake the whole trailer and awaken Mrs. Lewis' invalid father. It caused water to splash out of the toilet bowl, pictures to fall off the wall, and a band on a pressure cooker to fall off. Mrs. Lewis complained to appellant's Mr. Yates, and got relief with less severe blasting a couple of times. She made about 12 calls to appellant, and at times respondents were on the line also complaining. An unpleasant sulphur odor came from the mine, and Mrs. Lewis' housekeeping was increased because of the grimy dust coming from the mine field where work was completed.

John Rotert gave substantially the same version of their experience in living with appellant's blasting as did his wife, Elizabeth. He added that he and his wife complained of getting shocked and damaged and begged appellant to cut down the blasts or something. They got very little response although the shots were cut down occasionally, particularly after the call was made to appellant's president. The blasting disrupted respondents' lives, their business; there was a great deal of confusion and noise, which caused aggravation and disorientation to John who was blind and had to use his senses of hearing, touch and balance to function on his property and in his business of hog breeding and livestock raising.

Dr. Frank C. Fowler, a consulting chemical engineer, observed the damage to respondents' premises, and gave his opinion that the same was caused by appellant's blasting operations. From tables· he concluded as his opinion that suggested maximum values to avoid damage to a residence for explosives was 116 to 125 pounds for vertical holes as contrasted to‘ appellant's use of 25 pounds per hold for as many as 24 vertical holes—the explosion of a total of 300 pounds at a distance of 500 feet. Another table showed a value at 500 feet of only 100 pounds of explosive; and if 300 pounds were used it would be more than double the recommended value and one would expect to find damage in a home such as respondents which Dr. Fowler inspected. It makes no difference in the (ground) vibrations whether holes are drilled vertically or horizontally, it is the amount of explosive which affects it. Dr. Fowler tested the accumulated water in appellant's pit across the road and found it to be very acidic. As to appellant's two seismographic tests, the evidence showed that the first was made 7,300 feet from respondents' home with the seismograph set up 2,100 feet from the hole that was exploded. The second was made 2,100 feet east of respondents' home but with the seismograph set up in respondents' front yard. Dr. Fowler would not have been satisfied with those tests. He would have needed more readings and different locations, "and closer up would be helpful, 600 or a thousand feet." He testified on cross-examination: "I wouldn't be satisfied if I was them with two tests and continued· complaints. I wouldn't be satisfied with the result of that. Nor would I take the chance of going on." The results of the tests (which respondents had never seen) were, according to appellant's witnesses, that at 2,100 feet the vibrations were 17% of enough to do damage, and at 2,000 feet (with the seismograph set up in respondents' yard), the vibrations were 11% of enough to do damage to a structure.

█ Count I of respondents' second amended petition alleges that beginning in 1968 appellant commenced a course of conduct in its strip-mining operations which was willful, wanton and malicious in that it used high explosives indiscriminately and caused great noise, vibrations of earth, air concussion and shock waves, creating noxious fumes, odor, dust and smoke and damaged, respondents' property and persons. These allegations are incorporated by reference in all other counts of the petition. Appellant's argument is that there can be no recovery for Elizabeth's emotional dis-

tress, fright, annoyance, irritability, loss of sleep and ulcerous condition (under her Count IV) or for John's loss of her services and expenses for her medical care (under his Count V) because under Gambill v. White, 303 S.W.2d 41 (Mo.1957), Elizabeth's conditions were not accompanied by physical injury, and there was not, as an exception to that rule, evidence of willful and wanton conduct accompanying appellant's acts. The Gambill case sets forth the rule which governed it, loc. cit. 303 S.W.2d 43[1], " * * * [I]n the absence of evidence of an unlawful invasion of one's rights under circumstances of malice, wilfulness, wantonness, or inhumanity, there is no recovery for fright, terror, anxiety, mental distress, or nervousness, unless these are accompanied by some physical injury. (Citing cases)." Gambill is distinguishable on its facts from this case. There the action was for alleged *negligence* in permitting plaintiff to give birth to a child at a time when she was unattended. Her own testimony was that she suffered no injury, but merely suffered pain, nervousness, humiliation, and mental anguish. There were no circumstances, in connection with plaintiff's suffering, of malice, insult and injury, and hence the court did not err in directing a verdict in favor of the defendant doctors. Here the action, under Counts IV and V, are not based upon appellant's negligence in conducting its blasting operations, but is couched in terms of strict liability and resultant damage for blasting. Negligence is not an element of respondents' theories. Anno. 20 A.L.R.2d 1372, 1375 § 3; 1406 § 20; and see the Missouri cases collected and commented upon at 20 A.L.R.2d 1383; and 2 Harper and James, The Law of Torts, § 14.6, p. 812, et seq. There are two reasons why appellant's argument must fail. The first is that there were *physical* invasions of respondents' property by vibrations and concussion, although there were no rocks or debris cast upon it, and there was resultant damage. "And in this state when damage to property is by vibration or concussion from blasting there is

an invasion of the premises and liability irrespective of negligence quite as if the blasting had cast rocks or debris thereon. (Citing cases.)" Summers v. Tavern Rock Sand Company, 315 S.W.2d 201, 203[1, 2] (Mo.1958). See Garden of the Gods Village v. Hellman, 133 Colo. 286, 294 P.2d 597, 601 (Colo. banc 1956), *quoting from* Madsen v. East Jordan Irr. Co., 101 Utah 552, 125 P.2d 794, 795 (1942): " ' * * * Whether the cases are concussion or non-concussion, the results chargeable to the non-negligent user of explosives are those things *ordinarily resulting* from an explosion. Shock, air vibrations, thrown missles (sic) are all illustrative of the anticipated results of explosives; *they are physical as distinguished from mental in character.*' " (Italics added.); Barrow v. Georgia Lightweight Aggregate Company, 103 Ga.App. 704, 120 S.W.2d 636, 641 (1961) where it was alleged and the evidence showed that explosions were set off frequently, 3 or 4 times a day between 100 and 1,000 yards from plaintiff's house, breaking a window, shaking the house, casting rocks on the premises, cracking wall sheet rock and the foundation, and "did 'shake and vibrate plaintiff's body and cause plaintiff great and grievous discomfort, annoyance, and anxiety concerning the safety of himself, his dwelling and his family.' " The court stated (120 S.E.2d 641[4]), "This rule [that a trespasser is generally held liable for all damages proximately caused to the property] has been relied upon to impose liability upon the trespasser for personal injury to the owner and members of his household, *including liability for mental suffering*. Engle v. Simmons, 148 Ala. 92, 41 So. 1023, 7 L.R.A., N.S., 96; Prosser on Torts, 2d Ed., § 13, p. 58. See also 52 Am.Jur., Trespass, § 51 pp. 875–6, and cases there cited. We think this principle is sound, and accordingly hold that a trespass upon real property imposes liability for damage caused to property and person, including mental and physical injury of the owner and his family."; Ledbetter Brothers, Inc. v. Jenkins, 126 Ga.App. 413, 190 S.E.2d 797, 799, 800 (1972), following Bar-

row, supra; Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845, 850[7–9], "Actual damages resulting from a wrongful act are not limited to the pecuniary loss sustained thereby. They extend also to the mental and physical suffering which are considered a distinct element of damages and as such are actual and compensatory"; compare also Anno: Shock—Witnessing Property Damage, 28 A.L.R.2d 1070, 1087; and Anno.: Torts—Emotional Disturbances, 64 A.L.R.2d 100. See also Roshong v. Travelers Insurance Company, 281 So.2d 785 (La.App.1973).

Under the Summers case, supra, and the other cases and authority above cited and quoted, there is a valid basis for holding that respondents may recover Elizabeth's damages for her emotional distress, fright, annoyance, irritability, loss of sleep and ulcerous condition, and for John's loss of her services and expenses for her medical care, in the fact that there was an actual physical invasion of their property by vibrations and concussions resulting in injury.

■ The second reason why respondents are entitled to recover under their Counts IV and V, is that there was evidence that appellant's blasting operations, resulting in invasions of respondents' right of peaceable occupancy and use of their property, were conducted under circumstances of "malice, willfulness and wantonness." That concept of appellant's actions may be readily gleaned from the above recitation of the facts. Beginning in 1968, appellant received hundreds of complaints, not only from respondents, but also from Father Friedricksen and Mrs. Lewis. These complaints were to no avail—appellant's employees were indifferent, as the jury could find, to the plight of respondents and their neighbors. The blasting was *continuously* done, day and night, and although appellant's evidence is that its horizontal shots were reduced to five holes at a time in 1969 [the reduction in the holes blasted would only go to a claim of lack of negligence, which under the foregoing cases is not an issue or a defense in blasting and resultant damage cases, such as this one], its logs show that many more blasts, usually but not always, were done, apparently, and as is inferable, to compensate for the reduction. The evidence does not show that the blasting in vertical drill holes was reduced in number. Appellant had knowledge that its blasting operations were causing discomfort, annoyance, anxiety and damage to respondents' property, disrupting their lives, yet it persisted in continuing the blasting to a total of more than 800 shots during the time that respondents complained. These shots were accomplished by the use of more than twice the amount of explosive which would have avoided damage to respondents' property. Under all the facts, the jury was certainly authorized to find, as it did, that appellant's operations were done in complete disregard of respondents' rights, without just cause or excuse, and were thus tainted with malice, willfulness and wantonness. This conclusion is supported by the blasting case of Smith v. Aldridge, 356 S.W.2d 532 (Mo.App.1962). There, although there was a casting of rocks and debris on plaintiffs' premises 35 or 40 times during the four month period that blasting was conducted, the facts here are more aggravated. The Aldridge case held that there was ample evidence to submit the issue of whether defendant had acted maliciously, willfully or wantonly, and thus plaintiff wife could recover for her mental pain and anguish even though there was no physical injury to her. See also Marigold Coal, Incorporated v. Thames, (1963), 274 Ala. 421, 149 So.2d 276, 280[14, 15] (and pages 282 and 283 of the opinion for the facts, which include damages occurring over a year of blasting operations), in which case it was held that a charge to the jury that it could, in addition to actual or compensatory damages, assess a fine or penalty against defendant if it found it guilty of wanton conduct, was proper.

It follows that the trial court did not err in submitting Elizabeth's claim for emo-

tional disturbances, etc., resulting in her having ulcers; her claim for punitive damages; John's claim for loss of Elizabeth's services and attendant medical expenses; and his claim for punitive damages.

By Point IIA appellant claims that the verdict directing and measure of damage instructions were erroneous because they were meaningless to the jury in that they referred to different numbered counts; and the jury was never informed as to what the different counts pertained; and it had no way of knowing what issues it was deciding in reaching the different verdicts. An assignment of error covering Point IIA was not presented to the trial court in the motion for new trial and is therefore not preserved for review. It will not be noticed. Rules 79.03 and 84.13, V. A.M.R.

Appellant, in its Point IIB, claims that the verdicts on Count II (for blasting damage to the residence and other buildings—submitted in measure of damage Instructions Nos. 2 and 11); on Count III (for blasting damage occasioned by losses in respondents' pig farrowing business— submitted in measure of damage Instructions Nos. 3 and 12); and Count VII (for damages, in addition to and subsequent to the blasting damage aforesaid, for depreciation in the value of respondents' real estate because of creation of a permanent and private nuisance [as a result of appellant's premises emitting dust and sulphuric foul odors which further depreciated the value of respondents' property]—submitted in measure of damage Instructions Nos. 6 and 16) all constitute an impermissible splitting of respondents' joint claims for property damage into three parts. Appellant says this allowed the jury to make overlapping awards of damages.

Respondents' amended petition is misconstrued by appellant. All that it does is to set forth in different counts the *elements* of respondents' damages on the two separate theories (blasting damage and private, permanent nuisance) set forth. The type of pleading employed is proper; it made for clarity and precisely informed appellant of the nature of the demands; and it is certainly authorized by Rules 55.06(a); 55.10; and 55.11. See also 71 C.J.S. Pleading § 88c(2), p. 215, "The statement of the same cause of action in different ways or forms, each in a separate count, so as to meet different possible phases of the evidence as it may be developed at the trial, or so as to meet different possible legal views, is permissible, not only at common law, but also under some statutes and rules of court, * * *." Here, had respondents' claim been submitted in one count, there being two different theories of recovery on the separate items of damages, it possibly could have run afoul of what was said in King v. Morris, 315 S.W.2d 497, 498[4] (Mo.App.1958), "The allegations in the petition are broad and might well be construed as an effort on the part of the pleader to join two theories of recovery in one count, which is bad pleading." The allegations and the proof show that the damages occurred to respondents' property and business, the loss of their livestock, and for the nuisance at different times, and it was thus proper to set them forth in the petition in separate counts. There is no splitting of a cause of action in the sense that recovery is sought in successive suits upon the same cause of action. Two causes of action on separate theories for the losses claimed are set forth merely in separate counts, not overlapping *as pleaded,* and it is obvious that appellant's contention is without merit.

Appellant next claims by its Point IIC that the instructions given were not MAI mandatory instructions. The complaint relates to various damage instructions. It is first said that Instruction No. 11, submitting blasting damage to respondents' property is bad because it is based upon MAI 9.02 rather than MAI 4.02, which is on the subject of property damage only. Instruction No. 11 is:

"If you find the issues in favor of the Plaintiffs under Count II, you must

award Plaintiffs such sum as you believe is the difference between the fair market value of Plaintiffs' whole property immediately before the Defendant's blasting operations and the value of Plaintiffs' whole property immediately after such blasting operations, which difference in value is the direct result of the Defendant's blasting operations.—Not in MAI Based upon MAI 9.02."

Comparing Instruction No. 11 with MAI 4.02, it is seen that they would submit practically the same thing as the measure of damages, but with the added but unnecessary requirement that the "difference in value is the direct result of the Defendant's blasting operations." [Causation was submitted in the verdict directing Instruction, MAI 31.03, as to exploding ANFO.] However, upon the retrial of Counts II and VII for the reasons hereinafter mentioned, an instruction based upon MAI No. 4.02 should be given as it relates to Count II.

■ Count III of the petition alleged business or profit losses by reason of the death of pigs. It is not a property loss, and thus MAI 4.02, contrary to appellant's contention, is not the proper damage instruction. MAI 4.01, which was used, properly submitted the loss of business profits. Instruction No. 12, submitting damages under Count III, is not erroneous as urged by appellant.

■ With respect to Instruction No. 11, submitting the blasting damage under Count II, and Instruction No. 16, submitting damages to property because of permanent nuisance, appellant does not clearly state its real contention in its first brief. In its reply brief, the contention is obliquely but better stated in these words: "It would have been proper to separate the claims of the three different plaintiffs [Elizabeth Rotert, John Rotert, and both jointly] into a separate count for each but it was not proper to separate the claims of different items of damage into still different counts. Blasting vibrations, dust and odors were all incident to defendant's mining operations and plaintiffs' claim [is] that each of them damaged plaintiffs in certain respect but they all arose from the same acts or series of acts or same transactions or series of transactions of defendant and constitute but a single cause of action. * * * Instructions 11, 12 and 16 submit damages to plaintiffs' jointly held property and should have been submitted in one instruction, MAI 4.02." (As noted above, MAI 4.02 is not appropriate for submitting damage for loss of business profits under Count III).

Regardless of the number of causes pleaded and proved concerning property damage, there can be but one total and permanent damage to the property, although one cause may augment the other in ultimate damage. The vice in Instructions Nos. 11 and 16 is that they permitted the jury to assess two separate damages arising at different times and under different evidence, when there could be only one total damage to the property from all causes. There is no MAI covering this situation, but it would not have been improper to combine the different theories of Counts II and VII into one instruction, since as above stated, the measure of damages (depreciation in the fair market value of the property) is basically the same under both MAI. Thus the jury could return one verdict for the total property damage, if it found for plaintiffs under both counts. It would follow that if the two theories of the separate counts were incorporated into one instruction, then the jury by separate instructions should be given the option of assessing damages on either count, alternatively, necessarily finding no injury as to the other count. The separate damage instructions should be framed under MAI 4.02 as to Count II, and under MAI 9.02 for permanent nuisance under Count VII. To make it clear to the jury as to its options under the separate instructions, they should be prefaced with the words of this import: "If you find for plaintiffs under Count II, but not under Count VII, then

you must award plaintiffs * * *"; and "If you find for plaintiffs under Count VII, but not under Count II, then you must award plaintiffs * * *." For error in giving Instructions Nos. 11 and 16, a new trial must be had upon the issues raised by respondents' Counts II and VII.

Contrary to appellant's contention, MAI 9.02 is the appropriate instruction for submitting damages for permanent nuisance. Spain v. City of Cape Girardeau, 484 S.W.2d 498, 504[4] (Mo.App.1972); Bower v. Hog Builders, Inc., 461 S.W.2d 784, 797[5] (Mo.1970).

Appellant says that the court erred in excluding the testimony of its employee, received by the court outside the hearing of the jury, concerning appellant's experimentation to get good top dirt on top of the strip mined area so it would grow vegetation. Appellant says that the testimony as to experimentation was a statement of fact bearing upon the issue of nuisance and upon the issue of wilful, wanton and malicious conduct. In the posture presented, what appellant intended to accomplish by its experimentation (there being no offer of proof that it would have eliminated the nuisance or mitigated the damages therefor was speculative and conjectural, and the court did not abuse its discretion in excluding the testimony. How the matter will be presented, if so, upon new trial of Counts II and VII is unknown, but it should be noted that reclamation efforts could have no bearing upon the continuous blasting and resultant damage under Counts IV and V, the judgment thereon being herein affirmed. As to John Rotert's claim under Count VI, the basis for his recovery was his separate, personal discomfort for the temporary nusiance of blasting under the evidence, and it was properly submitted under MAI 4.01.

The last contention of appellant is that the verdicts are excessive and so excessive as to show bias and prejudice on the part of the jury. Since there must be a retrial on the issues of Counts II and VII, the point need not be considered as to them. As to Count III, the evidence clearly shows that respondents lost around 400 pigs from E. Coli scours bacteria which collected in the cracks of the farrowing barn floor, the cracks being caused by blasting vibrations. The profit from the sale of the pigs would have been $8.00 each, a total of $3,200.00, and additionally, respondents incurred over $1,000.00 for veterinary and medication bills. This verdict is supported by unchallenged evidence, and certainly is not excessive.

It is conceded by appellant that if there was a submissible case of willful, wanton or malicious conduct, the verdicts of $4,500.00 for Elizabeth's actual damages and $5,000.00 for John's loss of her services would not be out of line. The question descends to whether the verdicts for punitive damages were excessive, or were the result of bias and prejudice of the jury. As to the claim that the verdicts were the result of the bias and prejudice of the jury, appellant points to nothing which occurred during the trial which might have engendered that state of mind on the part of the jury, so that there would be " 'a clear absence of the honest exercise of judgment," ' or that the jury was actuated by improper motives. Bower, supra, loc. cit. 461 S.W.2d 806. The size of the verdict standing alone does not authorize an appellate court to reverse a judgment on the basis of passion and prejudice. Reynolds v. Arnold, 443 S.W.2d 793, 801[11] (Mo.1969). Appellant suggests that the blind condition of John Rotert during the five days of trial caused the courtroom to be overcharged with emotion. If there was anything which might have caused excessive emotion during the trial, including John's blind condition (who, as respondents say, is taken by appellant as it finds him), it was observable by the trial court, which here has declined to interfere with the verdicts for punitive damages.

As to the claim that the verdicts for punitive damages were excessive, appellant cites no case which is authority for a reduction in the amounts. There must, of course, be some reasonable relation of the amount of punitive damages to the injury inflicted, but there is no mathematical measure by which the reasonableness of the award may be measured. Wisner v. S. S. Kresge Company, 465 S.W.2d 666, 669[5–7] (Mo.App.1971). In Peak v. W. T. Grant Company, 386 S.W.2d 685, 693[16–18] (Mo. App.1964), it was said, "Included in the numerous factors the jury may consider in determining the amount of punitive damages to be assessed are the degree of malice, the age, sex, health and character of the injured party and the affluence of the tort feasor." Here, appellant was shown to have assets exceeding $585,000,000.00. Considering the length of time that appellant conducted its continuous blasting operations over the repeated protests of respondents and others, the fact that there was inflicted actual damage to respondents' property and to their health, the jury must have measured the amount of its award by the degree of malice and contumely characterizing appellant's acts. Chappell v. City of Springfield, 423 S.W.2d 810, 814 (Mo.1968); State ex rel. St. Joseph Belt Ry. Co. v. Shain, 341 Mo. 733, 108 S.W.2d 351, 356 (1937); and see Wehrman v. Liberty Petroleum Company, Inc., 382 S.W.2d 56, 66[26–28] (Mo.App.1964), holding, "Generally, punitive damages must bear some relation to *the injury*, though they need not bear any relation to the damages *allowed* by way of compensation."

The judgment is reversed and the case is remanded for new trial on Counts II and VII of the amended petition. That part of the judgment upon the verdicts upon Counts III, IV, V and VI are affirmed and these counts are remanded with directions to hold the judgment thereon in abeyance until disposition by new trial on Counts II and VII. Connoley v. Beyer Crushed Rock Co., 355 Mo. 684, 197 S.W.2d 653, 656[9] (Mo. banc 1946); Truck Insurance Exch. v. Great Northern Electric Co., 284 S.W.2d 60, 62[5] (Mo.App.1955). Interest on the counts held in abeyance shall run from the date of the rendition of the original judgment herein. § 512.160(4) RSMo 1969, V.A.M.S; Contour Chair-Lounge Company v. Laskowitz, 330 S.W.2d 817, 826[19] (Mo.1959). Costs on this appeal are taxed 71.6% to appellant and 28.4% to respondents.

All concur.